**DAVIS WALKER CORPORATION et al., Plaintiffs,**

v.

**W. Michael BLUMENTHAL et al., Defendants.**

Civ. A. No. 78–0421.

United States District Court, District of Columbia.

May 25, 1978.

Judith Richards Hope, Washington, D. C., for plaintiffs.

Michael Hertz, Special Asst. U. S. Atty., Michael Gadbaw, Atty., Dept. of the Treasury, Washington, D. C., for defendants.

Charles Owen Verrill, Jr., Washington, D. C., for defendant intervenor, Korf Industries, Inc.

## MEMORANDUM

GASCH, District Judge.

Plaintiffs Davis Walker Corporation and United International Corporation seek declaratory and injunctive relief with respect to the "trigger price mechanism" (TPM). Plaintiffs claim that the adoption by the Department of the Treasury (Treasury) of the TPM insofar as it pertains to steel wire rod contravenes the Antidumping Act, 19 U.S.C. §§ 160-173 (1970), *as amended*, (Supp.V 1975), is arbitrary and capricious in violation of section 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and is invalid for failure to comply with the rulemaking requirements of the APA, 5 U.S.C. § 553 (1976).

Davis Walker Corporation (Davis Walker) is a manufacturer of wire and wire products, such as barbed wire, chain link fence, and welded wire fabric. Plaintiff United International Corporation, a wholly-owned subsidiary of Davis Walker, purchases steel wire rod, the principal raw material used in the manufacture of wire and wire products, from foreign suppliers and then sells the wire rod to Davis Walker.[1] Defendants are the United States and five officials of the Department of the Treasury, W. Michael Blumenthal (Secretary), Anthony M. Solomon (Under Secretary for Monetary Affairs), Robert H. Mundheim (General Counsel), Peter D. Ehrenhaft (Deputy Assistant Secretary for Tariff Affairs), and Robert H. Chasen (Commissioner of Customs). Korf Industries, Inc. (Korf), parent company of Georgetown Steel Company of Georgetown, South Carolina and Georgetown Texas Steel Corporation of Vidor, Texas, was granted leave to intervene.

---

1. Although one of the largest domestic manufacturers of steel wire and wire products, Davis Walker is an independent wire producer which must purchase steel wire rod on the open market. It claims that because the domestic integrated steel mills do not have sufficient capacity to produce the amount of steel wire rod necessary to supply the domestic market for steel wire and wire products, it must purchase between 1 million and 1.5 million tons of wire rod per year from foreign suppliers.

BACKGROUND.

■ The Antidumping Act, 19 U.S.C. §§ 160–173 (1970), *as amended*, (Supp.V 1975), was enacted to protect American industries from the detrimental effects of importation of foreign goods at unfairly low prices. The statute ultimately authorizes the imposition of a "dumping duty" (the amount by which the product is sold below its "fair value" in the home market) against importers determined to be in violation of the Act. However, before this duty can be imposed, detailed statutory procedures must be followed.

The Court will briefly outline the procedures required by statute. The statute provides:

> (c)(1) The Secretary shall, within thirty days of the receipt of information alleging that a particular class or kind of merchandise is being or is likely to be sold in the United States or elsewhere at less than its fair value and that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States, determine whether to initiate an investigation into the question of whether such merchandise in fact is being or is likely to be sold in the United States or elsewhere at less than its fair value.

19 U.S.C. § 160(c)(1). If the Secretary decides to initiate an investigation, he must publish notice of this decision in the Federal Register. If the Secretary declines to initiate an investigation, all inquiry is ended and the case is closed. *Id.*

The Secretary is required, within six months after the publication of a decision to initiate an investigation, to make a tentative determination "whether there is reason to believe or suspect, . . . that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the constructed value)" and publish such determination in the Federal Register. 19 U.S.C. § 160(b)(1)(A). If the determination is affirmative, the Customs Service must withhold appraisement of the affected merchandise. *Id.*

The Secretary is required to make a final determination within three months after publication of the notice of the tentative determination. If the final determination is affirmative, the Secretary must notify the United States International Trade Commission (Commission). The Commission must determine within three months whether "an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States." 19 U.S.C. § 160(a). The Secretary must publish in the Federal Register both his and the Commission's determination, as well as a statement of findings, conclusions, and reasons.[2] If the determinations of the Secretary and the Commission are affirmative, a dumping duty is levied on the affected merchandise. 19 U.S.C. § 161. The imposition of such a dumping duty may be challenged in the Customs Court. 19 U.S.C. § 169.

The efficacy of the Antidumping Act procedures is one of the topics addressed in the Solomon Report, which was prepared by a task force formed in response to concern over the economic problems of the steel industry.[3] The Solomon Report traces the

---

**2.** The Secretary or the Commission, before making a determination pursuant to section 160(a), must conduct a hearing upon request of "any foreign manufacturer or exporter, or any domestic importer, of the foreign merchandise in question, or of any domestic manufacturer, producer, or wholesaler of merchandise of the same class or kind." 19 U.S.C. § 160(d)(1).

**3.** The Report cites the following problems confronting the United States steel industry:

its competitive position has eroded over time, and its traditional market is being en-

croached upon by substitute materials and by imports of steel;

its competition from imports, often at dramatically reduced prices, has increased as the world steel industry has stagnated;

*its earnings have dropped sharply and are considerably below historic levels;*

it must invest heavily to modernize and increase efficiency in order to remain competitive;

it must make substantial expenditures to meet environmental regulations; but

factors leading to the recent aggressive exporting by foreign steel producers and antidumping complaints. It noted that nineteen separate antidumping petitions involving steel products, an unprecedented number for a single industry in such a short period of time, were pending before the Treasury. *See* A. Solomon, Report to the President: A Comprehensive Program for the Steel Industry (Dec. 6, 1977) (Solomon Report).

The Report next described and evaluated the procedures and remedy under the Antidumping Act. The Task Force concluded that the statutory "procedure is too cumbersome to provide relief quickly from sudden surges of imports that may cause injury to an American industry." *Id.* at 12. The Task Force estimated that the entire statutory procedure, from the date a complaint was filed to the publication of a dumping duty, would take approximately thirteen months in addition to the time it takes the complainant industry to prepare the petition. It also noted the limitations imposed by the "specific product orientation of individual investigations and findings." *Id.* at 13.

The Task Force recommended that:

*the Department of the Treasury, in administering the Antidumping Act, set up a system of trigger prices, based on the full costs of production including appropriate capital charges of steel mill products by the most efficient foreign steel producers (currently the Japanese steel industry), which would be used as a basis for monitoring imports of steel into the United States and for initiating accelerated antidumping investigations with respect to imports priced below the trigger prices.*

*Id.* at 13–14 (emphasis in original). The President approved the Report on December 6, 1977.

it has had difficulty in raising the necessary capital for these expenditures under present market conditions.
Solomon Report, at A-1. Moreover, the Treasury has represented to the Court that sixteen steel plants closed or suffered permanent cut-

On December 30, 1977, the Treasury published in the Federal Register a notice of proposed rulemaking relating to a new Customs invoice, the Special Summary Steel Invoice (SSSI), for certain steel mill products. In the introductory comments to this notice, the Treasury, characterizing the SSSI as one aspect of the TPM, announced its intention to implement the TPM. It described the TPM as a four-part system:

(1) The establishment of trigger prices for steel mill products imported into the United States; (2) adoption of a new Special Summary Steel Invoice ("SSSI") applicable to imports of all steel mill products; (3) the continuous collection and analysis of data concerning (a) the cost of production and prices of steel mill products in the countries that are the principal exporters of such products to the United States, and (b) the condition of the domestic steel industry; and (4) where appropriate, the expedited initiation and disposition of proceedings under the Antidumping Act of 1921 with respect to imports below the trigger prices.

42 Fed.Reg. 65,215 (1977) (to be codified in 19 C.F.R. § 141). The Treasury also explained the general method for computing trigger prices, the products for which it intended to develop trigger prices, and the way in which the SSSI would be used to monitor imports and expedite investigations. While the purpose, methods, and limitations of the TPM are described in the introductory comments of the notice, the notice of proposed rulemaking pertained only to the use of the SSSI. Final regulations on the SSSI were promulgated on February 13, 1978, and became effective on February 21, 1978. 43 Fed.Reg. 6065 (1978).

On January 3, 1978, the Treasury announced trigger prices for certain steel mill products, including steel wire rod. These trigger prices were published in the Federal Register on January 9, 1978, and became

backs in 1977, and employment in the industry dropped from 472,000 to 437,000 within four months in 1977. Defendants' Response to Plaintiffs' Memorandum of Points and Authorities at 8.

effective on that date to all goods entering the United States on or after February 21, 1978. 43 Fed.Reg. 1464 (1978).

On January 27, 1978, the Treasury announced trigger prices for steel "extras," including "extras" for steel wire rod. These prices were published in the Federal Register on February 3, 1978, and became effective on that date with respect to all goods entering the United States on or after February 21, 1978. 43 Fed.Reg. 4703 (1978).

Plaintiffs assert three legal theories in this lawsuit. First, plaintiffs claim that the TPM circumvents the procedures prescribed in the Antidumping Act by establishing a minimum price system that will deter imports of steel mill products at prices below the published prices, without regard to the fair value of such imports or whether such imports are likely to injure an American industry. Second, plaintiffs contend that the TPM is a substantive rule subject to the rulemaking requirements of the APA, 5 U.S.C. § 553 (1976), and is therefore invalid for failure to comply with these requirements. Finally, plaintiffs assert that the TPM insofar as it pertains to steel wire rod is arbitrary and capricious. In response, defendants filed a motion to dismiss or, in the alternative, for summary judgment.

After a hearing on the motion for preliminary injunction, the Court on March 24, 1978, concluded that plaintiffs "demonstrated a substantial likelihood of succeeding on the merits of its claim that the inclusion of steel wire rod in the 'trigger price system' without the simultaneous inclusion of steel wire and wire products is arbitrary and capricious in violation of section 706(2)(A) of the Administrative Procedure Act." Accordingly, it ordered the Secretary to make findings with respect to the effects on domestic producers of steel wire and wire products of the inclusion of steel wire rod in the TPM without the simultaneous inclusion of steel wire and wire products. Finally, the Secretary was "enjoined preliminarily from the continued enforcement of the 'trigger price mechanism' as it pertains to steel wire rod pending this Court's review

of the Secretary's findings." The Secretary's findings were filed with the Court on April 10, 1978.

The motions for summary judgment and for continuance of the preliminary injunction are presently pending before this Court. For the reasons stated below, the Court will dissolve the preliminary injunction and grant summary judgment for defendants on all three issues.

JURISDICTION.

Defendants claim that the Customs Court has exclusive jurisdiction to address the issues in this case. They base this claim on 28 U.S.C. § 1582, which provides:

(a) The Customs Court shall have exclusive jurisdiction of civil actions instituted by any person whose protest pursuant to the Tariff Act of 1930, as amended, has been denied, in whole or in part, by the appropriate customs officer, where the administrative decision, including the legality of all orders and findings entering into the same, involves: . . . (2) the classification and rate and amount of duties chargeable; (3) all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury; (4) the exclusion of merchandise from entry or delivery under any provisions of the customs laws; . . . .

Defendants assert that since section 1582 vests the Customs Court with exclusive jurisdiction to determine the "legality of all orders and findings" relating to an antidumping proceeding, plaintiffs' claims must be addressed to the Customs Court when and if a dumping duty is assessed on goods as to which an antidumping investigation was initiated.

It is well established that the Customs Court has exclusive jurisdiction over an action challenging a decision with respect to the imposition of an antidumping duty. The exclusive jurisdiction of the Customs Court extends to all statutory and constitutional claims relating to the antidumping proceeding. *See J. C. Penney Co. v. United States Department of Treasury,* 319 F.Supp. 1023 (S.D.N.Y.1970), *aff'd,* 439

F.2d 63 (2d Cir.), *cert. denied,* 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1970). However, such constitutional and statutory claims cannot be reviewed in the Customs Court until there has been an administrative denial of a protest to an antidumping finding. *See J. C. Penney Co. v. United States Department of Treasury, supra.*

■■ While the Customs Court usually has exclusive jurisdiction in suits involving antidumping duties, all cases involving the Antidumping Act do not fall within the jurisdiction of that court. *See Timken Co. v. Simon,* 176 U.S.App.D.C. 219, 224 n. 7, 539 F.2d 221, 226 n. 7 (1976). Jurisdiction lies in the federal court over customs-related matters where no adequate remedy exists in the Customs Court. *See, e. g., Sneaker Circus, Inc. v. Carter,* 566 F.2d 396 (2d Cir. 1977); *SCM Corp. v. United States International Trade Comm'n,* 179 U.S.App. D.C. 110, 549 F.2d 812 (1977); *Timken Co. v. Simon,* 176 U.S.App.D.C. 219, 539 F.2d 221 (1976).

*Sneaker Circus, Inc. v. Carter, supra,* although involving a different statute, is analogous to the instant case. The plaintiffs in that case challenged certain trade agreements, which limited footwear imports, on the ground that the agreements were not negotiated in conformity with the procedural requirements of the Trade Act of 1974. The Court, rejecting the argument that the Customs Court had exclusive jurisdiction over the case, stated:

> There is . . . every likelihood that the agreements will be effectively enforced abroad, with the result that no occasion for protest . . . will ever

present itself, and no Customs Court jurisdiction under 28 U.S.C. § 1582 will arise. The point is not that the dispute is not presently ripe for adjudication in the Customs Court, but rather that the case will never ripen sufficiently to meet the statutory requirements for jurisdiction. When this situation occurs, jurisdiction over a customs matter which presumptively inheres in the Customs Court reverts to the District Court under 28 U.S.C. § 1331 and 1337.

566 F.2d at 399–400 (footnote omitted).

■ Similarly, in the instant case, there is a strong likelihood that plaintiffs will not obtain review in the Customs Court. Most foreign suppliers refused to sell steel wire rod at prices below the trigger prices while the TPM was in effect with respect to steel wire rod. If the TPM is reinstituted in respect to steel wire rod and most foreign suppliers refuse to sell steel wire rod below the trigger prices, then an antidumping investigation will probably not be initiated, dumping duties will not be imposed, and judicial review in the Customs Court will not be available.[4] The Court therefore finds that jurisdiction lies with the District Court in the instant case.

MERITS.

A. *Whether the TPM Violates the Antidumping Act.*

■ Plaintiffs argue that the TPM, by deterring the importation of goods at less than the trigger price and thereby establishing the trigger price as the minimum price for the affected goods, was intended and has had the effect of circumventing the

---

4. Defendant-intervenor Korf also argues that plaintiff Davis Walker lacks standing, since it does not have a legally protected interest that is adversely affected by the TPM. Korf notes that plaintiff merely alleges that it is unable to obtain steel wire rod below the trigger price and does not allege that any foreign producer refuses to sell to plaintiffs at a price below the trigger price but above the price that such producer could charge without violating the Antidumping Act. Thus, Korf concludes that plaintiff is really seeking the right to obtain "dumped" goods and has no legal interest to challenge Treasury's actions on these grounds.

Korf's claim clearly lacks merit. The "legal interest" test is not the appropriate standard for standing. In order to establish standing, plaintiff must show that (1) the challenged action caused him injury in fact; and (2) his interest is arguably within the zone of interests to be protected. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Southern Mutual Help Ass'n, Inc. v. Califano,* 187 U.S.App.D.C. 307, 574 F.2d 518 (1977). Plaintiff has clearly satisfied this standard.

elaborate statutory Antidumping Act procedures. Plaintiffs contend that virtually every foreign supplier of steel wire rod will refuse to offer steel wire rod at less than the trigger price, if the trigger price mechanism operates with respect to steel wire rod. They further contend that, because steel wire rod will not be imported at less than the trigger price, antidumping investigations will never be initiated. They finally argue that the TPM in effect imposes a dumping duty with respect to all goods for which trigger prices have been set without following the Antidumping Act procedures.

The Court finds that this claim may appropriately be resolved on summary judgment, since no issues of material fact remain in dispute. The Court holds, upon review of the Solomon Report, announcements in the Federal Register and other information concerning the TPM released by the Treasury, the Antidumping Act, and the legislative history, that the adoption of the TPM is within the Treasury's authority, to administer the Antidumping Act.

As noted earlier, the TPM is described in the Solomon Report as

a system of trigger prices, based on the full costs of production including appropriate capital charges of steel mill products by the most efficient foreign steel producers (currently the Japanese steel industry), which would be used as a basis for monitoring imports of steel into the United States and for initiating accelerated antidumping investigations with respect to imports priced below the trigger prices.

The trigger price mechanism is intended to provide the Secretary of the Treasury with a basis for initiating antidumping investigations without any prior industry complaint. Such authority exists under the Antidumping Act although it has not been used in recent years. As such it does not detract from any of the legal rights that foreign producers or the domestic industry presently enjoy under the Act. The trigger price is also a device for applying the resources of the Treasury Department to a constant monitoring of imports affecting a particularly sensitive industry viewed as a whole, instead of focusing on the investigation of individual complaints with respect to specified products—and then taking expedited action under the law.

Solomon Report, at 13–14. The extent of coverage of the TPM, the methodology to be used in calculating trigger prices, and the Treasury's procedures for implementing the system are discussed in the notice of proposed rulemaking concerning the adoption of the special invoice in the Federal Register, and other press releases issued by the Treasury as well as in the Solomon Report. The Treasury stated that the TPM would cover only "steel mill products" as defined by the American Iron and Steel Institute (AISI) and therefore would not extend to fabricated articles. However, the Treasury noted that it would consider including additional products should circumstances warrant it. The Treasury indicated that it would also establish trigger prices for the "extras" for those steel mill products for which trigger prices had been set.

The Treasury announced that, in developing trigger prices, it would utilize and adjust information reflecting the cost of production of the particular product supplied by the Japanese steel industry, which is considered to be the most efficient steel industry in the world. The information was to be collected from the six major integrated steel companies as well as several smaller nonintegrated steel makers in Japan.

The Treasury announced that it would administer the TPM by requiring that each importer of steel mill products subject to the TPM present at entry the new Special Summary Steel Invoice, which requires the identification of base prices and "extras." These prices would be compared with the applicable trigger prices. Invoices reflecting costs below trigger prices would be quickly identified and referred to the Customs headquarters in Washington, D. C. for review. If Customs officials determine, after review of the information forwarded and other information available to the

Treasury regarding the home market sales prices, that the product was probably sold at less than "fair value," they would recommend that the Treasury initiate an investigation. If the Treasury decides to initiate an investigation, all of the Antidumping Act procedures would then apply.

The evidence submitted by plaintiffs, particularly the Treasury materials that describe the trigger price system, reveals that the TPM is merely a device to monitor imports and to provide the Secretary with sufficient information to enable him to determine whether to self-initiate an investigation. The TPM itself does not establish any restrictions upon the affected industry; rather it serves to aid the Treasury in its administration of the Antidumping Act. The implementation of the TPM does not *by its terms* set trigger prices as minimum import prices or preclude the importation of goods at less than trigger prices. Plaintiffs have not and could not so argue.

■ The main thrust of plaintiffs' argument is that the effect of the trigger price system is to circumvent the Antidumping Act procedures. Plaintiffs claim that the implementation of the TPM with respect to steel wire rod has caused foreign manufacturers to raise prices to the trigger price level and that such a uniform price increase is tantamount to an across-the-board imposition of a dumping duty. The Court rejects plaintiffs' interpretation: The decision by foreign manufacturers to increase prices to the trigger price level is not the legal equivalent of the imposition of dumping duties with respect to all such goods imported at the trigger price level. Moreover, the decision of foreign steel wire rod manufacturers to increase prices does not allow the Secretary to avoid the statutory procedures. Thus, the Court concludes that, even if plaintiffs' allegations concerning the factual effects of the TPM (*i. e.,* foreign manufacturers' refusal to sell steel wire rod at less than trigger prices) were true, the TPM would not be contrary to the Antidumping Act.

The only direct effect of the TPM is a greater probability that antidumping inves-

tigations will be initiated for imports below trigger prices. Significantly as the Treasury has repeatedly stated, the importation of goods at below trigger prices "will not, by itself, result in any action by the Department." 42 Fed.Reg. 65,215 (1977). The Treasury explains that in those cases

> in which a shipment is found to be at prices below applicable trigger prices, the Customs Service may initiate immediate, informal inquiries of the importer to determine whether such sale is less than fair value within the meaning of the Antidumping Act. Unless the Secretary is satisfied within the time to be allotted therefor, that no reasonable possibility of sales at less than fair value may be found, an antidumping proceeding notice will promptly be published with respect to that shipment and other shipments of such or similar merchandise from the same exporter or from the same country of exportation as he deems appropriate.

43 Fed.Reg. 1468 (1978). Conversely, importation at prices above trigger prices will not necessarily foreclose the possibility of investigation, since an investigation by the Secretary may be triggered by a private industry complaint.

Regardless of whether an investigation is self-initiated by the Secretary on the basis of TPM information or is prompted by an industry complaint, *all* the statutory procedures must be followed before a dumping duty may be imposed. The Treasury emphasized:

> Implementation of the trigger price mechanism is not intended to deny to any party interested in the importation of steel mill products any rights it may have under the Antidumping Act or other applicable law. It is intended and will be used solely to enable the Secretary to determine on an expedited basis whether or not to initiate antidumping proceedings . . . and to reach the stage of making a tentative determination with respect to sales at less than fair value within a period substantially shorter than

the six months provided in section 153.32 of the Customs regulations.

*Id.*

 Having ascertained that the TPM is a guide to aid the Secretary in determining whether to self-initiate an antidumping investigation, the only remaining question is whether the Secretary has authority to monitor information and self-initiate an investigation. The statute does not expressly address the Secretary's authority to self-initiate an investigation. However, it does give the Secretary authority to "make rules and regulations necessary for the enforcement [of the Act]." 19 U.S.C. § 173. More specifically, the Act does not specify or restrict the means by which the Secretary obtains the information upon which he bases the decision to initiate an investigation; it merely provides that the Secretary shall determine whether to initiate an investigation after receipt of information alleging an Antidumping Act violation. 19 U.S.C. § 160(c)(1).

The regulations also do not restrict the source or method by which the Secretary obtains information concerning Antidumping Act violations. They specify the form and content of the information that must be submitted by private industry or Customs officers to support the antidumping complaint. *See* 19 C.F.R. § 153.28–.27 (1977). Thus, the language of the statute supports the conclusion that the Secretary has authority to self-initiate antidumping investigations.

The legislative history also supports this conclusion. The Senate Report stated that a dumping duty

would be applicable only to unappraised entries which had been entered within 120 days before the question of dumping was first raised by or presented to the Secretary of the Treasury.

S.Rep. No. 2326, 83d Cong.2d Sess. 5 (1954), U.S.Code Cong. & Admin.News 1954, pp. 3900, 3904. This statement reveals that Congress assumed that the Secretary would have authority to initiate an investigation.

The Court concludes that the implementation of the TPM was within the Secretary's authority to administer the Antidumping Act. Thus, the Court will grant summary judgment in favor of defendants on the issue of whether the TPM contravenes the Antidumping Act.

### B. *Whether the TPM is Invalid For Failure to Comply With APA Rulemaking Requirements.*

Plaintiffs characterize the TPM as a substantive rule to which the APA rulemaking requirements, 5 U.S.C. § 553, apply. Plaintiffs primarily rely on a line of cases that utilize the so-called "substantial impact" test to determine whether the agency action is a substantive rule subject to the APA notice and comment procedures or is an interpretative rule, policy statement, or agency practice or procedure specifically exempted from APA rulemaking requirements. *See, e. g., Pickus v. United States Board of Parole,* 165 U.S.App.D.C. 284, 290, 507 F.2d 1107, 1113 (1974); *Nader v. Butterfield,* 373 F.Supp. 1175 (D.D.C.1974).

Defendants contend that the TPM, a guide for the enforcement of the Antidumping Act, is merely an internal agency procedure for the Antidumping Act. They thus appear to argue that the TPM is an agency practice, procedure, or policy statement specifically exempted from the APA rulemaking requirements. 5 U.S.C. § 553(b)(3)(A). Defendants and defendant-intervenor rely in part on cases that adopt the "legal effect" standard for distinguishing substantive rules from agency action to which the rulemaking requirements do not apply. *See, e. g., Pacific Gas & Elec. Co. v. FPC,* 164 U.S.App.D.C. 371, 375, 506 F.2d 33, 37 (1974).

As the arguments of counsel reveal, resolution of this issue depends upon how the TPM is classified rather than upon a factual determination. Since no issues of material fact remain in dispute, this issue may also be resolved on summary judgment.

Section 4(a) of the Administrative Procedure Act requires notice and comment procedures for substantive rules but specifically exempts "interpretative rules, general

statements of policy, or rules of agency organization, procedure, or practice" from these requirements. 5 U.S.C. § 553(b). The APA defines rule as

the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency

5 U.S.C. § 551(4). While neither the APA nor the legislative history define policy statement or delineate how a policy statement may be distinguished from a rule, the Attorney General's Manual on the APA describes general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which an agency proposes to exercise a discretionary power." Attorney General's Manual on the Administrative Procedure Act at 30 n. 3 (1947). The Court of Appeals for the District of Columbia Circuit has afforded this definition "considerable weight because of the very active role that the Attorney General played in the formulation and enactment of the APA." [5] *Pacific Gas & Elec. Co. v. FPC*, 164 U.S.App.D.C. 371, 376, 506 F.2d 33, 38 n. 17 (1974).

*Pacific Gas & Elec. Co. v. FPC, supra*, in which an order setting forth the Commission's view that priority for gas deliveries during periods of curtailment should be based on the end use of the gas rather than prior contractual commitments was characterized as a policy statement, provides guidance for distinguishing policy statements from substantive rules. The D.C. Circuit considered the crucial distinction to be the different precedential effect of policy statements and rules. According to the D.C. Circuit, while a substantive rule "establishes a standard of conduct which has the force of law," a policy statement neither establishes a 'binding norm' nor is "determi-

native of the issues or rights to which it is addressed." 164 U.S.App.D.C. at 376, 506 F.2d at 38.

██ Applying these authorities to the instant case, the Court concludes that the TPM is a policy statement. The TPM clearly falls within the definition of policy statement in the Attorney General's Manual, since it serves to apprise the public and guide the Treasury in the administration and enforcement of the Antidumping Act. The TPM appears to be similar in nature to guidelines adopted without prior rulemaking by other agency or Executive Branch officials in the exercise of their discretionary authority. For example, the Department of Justice Merger Guidelines (1968), which set forth the market conditions under which the Antitrust Division will ordinarily challenge a merger as being a violation of section 7 of the Clayton Act, 15 U.S.C. § 18 (1976), were adopted without rulemaking. Although these guidelines, like the TPM, definitely affect behavior in the business community, they serve "to insure that the business community, the legal profession and other interested persons are informed of the Department's policy of enforcing [the Act.]" Department of Justice Merger Guidelines § 1.[6]

As in *Pacific Gas & Elec. Co. v. FPC, supra*, the TPM does not impose rules or restrictions on the regulated industry or the public, and the Treasury consistently characterized it as a guide to aid the Secretary in the administration and enforcement of the Antidumping Act, *see, e. g.*, 43 Fed.Reg. 6065 (1978); 42 Fed.Reg. 65,214 (1977), rather than a substantive rule. Moreover, the TPM does not lead directly to final agency action but merely to·the possibility of initiation of an antidumping investigation. Indeed, as the Treasury has reiterated, importation of goods below trigger

---

**5.** Several tests for distinguishing rules from policy statements have been suggested. According to one commentator, policy statements are rules addressed to the agency staff rather than to the public. Another argues that the label adopted by the agency is generally determinative. *See* Asimow, *Public Participation in*

the Adoption of Interpretive Rules and Policy Statements, 75 Mich.L.Rev. 521, 533 (1977).

**6.** *See United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061, 1072–1073 (S.D.N.Y.1969), *aff'd* 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971).

prices will not in itself result in a decision to initiate an investigation.[7] *See, e. g.,* 42 Fed.Reg. 65,214 (1977).

This Court's conclusion is also supported by policy considerations. A decision that the TPM insofar as it pertains to steel wire rod is invalid because of a failure to comply with the APA rulemaking requirements would effectively invalidate the entire TPM. Such action would seriously hinder the Treasury in its efforts to address the critical economic problems in the United States steel industry.

Finally, the Court notes that the Secretary held hearings and received comments from interested parties on aspects of the TPM at issue in this case. The Secretary, pursuant to this Court's order of March 24, 1978, submitted findings to this Court. It appears to the Court that in light of the procedures already utilized by the Treasury, little would be gained from ordering the Secretary to follow the notice and comment procedures of section 4 of the APA.

The Court concludes that the TPM is not invalid for failure to follow the APA notice and comment procedures. Accordingly, the Court will grant summary judgment in favor of defendants on this issue.

### C. *Whether the TPM Insofar as it Pertains to Steel Wire Rod is Arbitrary and Capricious.*

█ Plaintiffs claim that the adoption of the TPM insofar as it pertains to steel wire rod is arbitrary and capricious in violation of section 10(e) of the APA, 5 U.S.C. § 706(2)(A), for two reasons. First, they claim that the decision to limit the TPM to AISI steel mill products only, which includes steel wire rod but excludes many wire and wire products from TPM coverage, was arbitrary. Second, they contend that the trigger prices for steel wire rod were arbitrarily set too high.

Plaintiffs were granted unusually extensive discovery on an expedited basis. Despite such opportunity for discovery, plain-

tiffs have failed to demonstrate to the Court that the Treasury's decision was arbitrary and capricious. Since no facts material to the resolution of this issue remain in dispute, the Court will grant summary judgment for defendants on this issue.

█ The scope of review under the arbitrary and capricious standard is narrow. "The Court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The Court must affirm an agency if there is a rational basis for the agency's decision. *See Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 406–407, 541 F.2d 1, 34–35 *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). In making such a determination, the Court must engage in a "searching and careful" inquiry into the facts and "consider whether the decision was based on a consideration of the relevant factors." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823–24.

█ The Court will first address plaintiffs' argument that the Treasury's decision to limit coverage of the TPM to steel mill products was arbitrary. The Solomon Report, the Secretary's Findings, and other information concerning the TPM released by the Treasury indicate that the decision to institute the TPM was based on a careful study of the problems within the steel industry and on the recognition that these problems required immediate attention. The Treasury had been aware of antidumping complaints involving steel products and the inadequacy of the then existing Antidumping Act procedures. To make more effective the enforcement of the Antidumping Act, *see* 19 U.S.C. § 173, the Treasury adopted the TPM.

The Treasury has adopted and intends to adopt trigger prices only for those goods classified as steel mill products by the American Iron and Steel Institute (AISI).

---

**7.** The Court finds the cases cited by plaintiffs in which the "substantial impact" standard is adopted inapposite, since the action therein is

of a different nature from the agency action in the instant case.

This list consists of 32 product categories; the products that fall within these categories historically have been produced in steel mills.

The Court finds the decision to limit the TPM to AISI steel mill products, even though many wire and wire products are not covered, was rational.[8] The AISI is well recognized within the steel industry. The Treasury, by limiting the TPM to these 32 product categories, can more effectively deal with the most serious problems in the basic steel industry. As defendant Peter D. Ehrenhaft, Deputy Assistant Secretary of the Treasury for Tariff Affairs, observed, if the Treasury departed from the AISI list and attempted to include other fabricated articles, "the task of developing trigger prices would be enormously expanded because of the infinite range, diversity and complexity of such fabricated items." Deposition of Peter D. Ehrenhaft at 247. Indeed, a great deal of work is required to develop trigger prices for one additional category, which often encompasses a number of different products. Moreover, it would be extremely difficult to develop a rationale for limiting the categories of fabricated products that should be added.

■ The gist of plaintiffs' complaint is that the coverage by the TPM of the semifinished product, steel wire rod, but not all finished wire and wire products is arbitrary and capricious. While it may appear rational to include steel wire rod and all wire and wire products in the TPM, it is not irrational to exclude some of the wire products. Indeed, if the Treasury expanded the TPM to include all fabricated steel products on the same theory that plaintiffs present,[9]

the Treasury would be unable to devote sufficient enforcement resources to the basic steel mill industry. Thus, the decision to limit the TPM to AISI steel mill products has a rational basis, as it allows the Treasury to focus its enforcement energies on the area most urgently needing attention, the basic steel mill industry.[10]

■ Finally, the Court will consider plaintiffs' claim that the trigger prices were arbitrarily set too high. The Court notes at the outset that it must affirm the Treasury if the Court finds a rational basis for the Treasury's calculations. It is not necessary that the Court find the Treasury's method and price to be "the only reasonable one, or even that this Court would have reached the same result." *Jennings v. Shultz*, 355 F.Supp. 1198, 1207 (D.D.C.1973).[11]

■ The theory underlying the Treasury's calculations of trigger prices is that "the 'fair value' of imported products is unlikely to be lower than the costs of production by the world's most efficient producer." Findings of the Department of the Treasury at 13. Since the Japanese steel industry is generally considered to be the most efficient, the Treasury based the trigger prices on the production costs of six Japanese integrated steel producers supplied by the Japanese Ministry of International Trade.

In setting trigger prices for steel wire rod, the Treasury utilized data from the six largest Japanese integrated steel companies on the model cost per ton of finished steel. The Treasury, after careful review of the available evidence, made adjustments to the Japanese data for yield per ton, labor productivity, exchange rate, and profit rate.

8. The fact that the parties disagree over the percentage of wire and wire products covered by the TPM and other similar facts is therefore immaterial to the resolution of this issue.

9. A court need not tailor a program to fit the interests of each affected party. *See American Nursing Home Ass'n v. Cost of Living Council*, 497 F.2d 909, 914–15 (Temp.Emer.Ct.App. 1974).

10. Again, the Court notes that the fact that the TPM does not extend to all wire products does

not mean that plaintiffs have no remedy against the importation of wire and wire products at unfairly low prices. Plaintiffs may still file an antidumping complaint with the Treasury. The TPM does not deny any rights previously existing under the Antidumping Act.

11. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 800, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). It would therefore be insignificant if plaintiffs' proposed method and prices were more finely tuned.

The Treasury then multiplied this adjusted figure for the average cost of production of a net ton of finished steel by a coefficient supplied by the Japanese that reflects the portion of the cost of steel wire rod to the average cost of finished steel. Deposition of Robert W. Crandall at 100–01.

Plaintiffs challenge every step of the Treasury's calculations. First, plaintiffs contend that it was inappropriate to base calculations solely on the production costs of Japanese integrated steel companies, particularly since the cost of production of Japanese mini-mills is lower. In light of the fact that Japanese mini-mills do not currently export steel wire rod, *see* Findings of the Department of the Treasury at 17, the Treasury's reliance upon data from the integrated steel companies was reasonable.

Plaintiffs complain that the "Japanese costs do not form the basis of the trigger price system because Treasury made various adjustments in the Japanese Data." Plaintiffs' Summary of Evidence in the Record at 13. However, the Treasury clearly has authority to evaluate raw data and make adjustments upon careful consideration of all the information available. It appears to the Court that Robert W. Crandall and William J. Vaughn, the economists primarily responsible for developing these prices and, in particular, for making these adjustments, made such a careful study.

Plaintiffs also argue that these adjustments were based on an improper interpretation of the method for ascertaining "fair value" set forth in the Antidumping Act. This argument is totally erroneous. The trigger price is not the equivalent of "fair value" under the Antidumping Act. Indeed, the TPM does not even set minimum prices. The trigger prices merely serve as enforcement guidelines for the Treasury.

For the reasons stated above, the Court finds the calculations utilized by the Treasury to set trigger prices for wire rod were reasonable. Thus, the Court holds that the adoption of the TPM is not arbitrary and capricious within the meaning of section 10(e) of the APA for either of the reasons asserted by plaintiffs. Accordingly, the Court concludes that defendants are entitled to summary judgment on this issue.

CONCLUSION.

Upon review of the Secretary's findings and the entire record herein, the Court will dissolve the preliminary injunction entered on March 24, 1978. The Court will grant summary judgment in favor of defendants on all of the claims presented. Accordingly, the entire action is dismissed with prejudice.