**JERLIAN WATCH COMPANY, INC.,
et al., Appellants,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE and United States Department of the Interior, Appellees.**

**No. 79–4144.**

United States Court of Appeals,
Ninth Circuit.

May 25, 1979.

---

Jack B. Owens, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for appellants.

David M. Cohen, Washington, D. C., for appellees.

Before GOODWIN, SNEED, and ANDERSON, Circuit Judges.

PER CURIAM:

A number of watch manufacturers sued the Secretaries of Interior and Commerce to challenge the validity of the 1979 Allocation Rules, 43 Fed.Reg. 60313 (Dec. 27, 1978), promulgated pursuant to the Secretaries' authority under Headnote 6(d), Schedule 7, Part 2(E), of the Tariff Schedules of the United States, 19 U.S.C. § 1202. The district court dismissed the action for want of jurisdiction, on the ground that exclusive jurisdiction lay in the Customs Court under 28 U.S.C. § 1582(a). Because the challenged rules are substantially related to a traditional customs purpose, and because plaintiffs have an adequate remedy in the Customs Court, we affirm.

Prior to the 1954 Customs Simplification Act, products of Guam and American Samoa entered duty free, whereas products of the U.S. Virgin Islands were subject to duty if they contained foreign material to the value of more than 20 percent of their total value. See S.Rep. No. 1679, 89th Cong., 2d Sess., reprinted in [1966] U.S.Code Cong. & Admin.News, pp. 4389, 4390.

The 1954 Act permitted duty-free entry into the United States of certain articles if they did not contain foreign materials to the value of more than 50 percent of their total value. Customs Simplification Act of 1954, Pub.L. No. 83–768, § 401, 68 Stat. 1139 (1954) (prior to 1966 amendments). The purpose of the 1954 statute was to provide uniformity of treatment among the possessions and to stimulate the development of light industry in the possessions. See S.Rep. No. 1679, 89th Cong., 2d Sess., reprinted in [1966] U.S.Code Cong. & Admin.News, pp. 4389, 4390.

In 1966, Congress passed Public Law 89–805, which reiterated the duty-free status, of insular products that did not contain foreign materials to the value of more than 50 percent of their total value. However, the Act modified the program to include an annual quota limiting the importation of duty-free watches from the insular possessions. The quota was set at one-ninth of the prior year's United States watch consumption. This quota was further divided into subquotas allocated among each of the three insular possessions.

The 1966 amendments were prompted by a concern that the domestic watch industry would be harmed by the increasing level of duty-free importation from the insular possessions. The Senate Report stated, in part:

"The Committee on Finance recognizes that it may be appropriate to favor our insular possessions over direct imports so long as no domestic industry is harmed by the policy.

" * * * [I]t became equally clear that, if left unchecked, the Virgin Islands assembly operation soon would become little more than a convenient device for funneling foreign watches into this country—without payment of any duty what-

soever—and this would have a substantial adverse effect on domestic production of jewel-lever watch movements. Such an impact would be contrary to the purpose of today's relatively high duty on watches and watch movements.

\* \* \* \* \* \*

"More importantly, if the Virgin Islands operation \* \* \* is allowed to go unchecked, it would soon overpower the domestic industry \* \* \* ." *Id.* at 4395–96.

In 1975, Congress noted setbacks in the insular watch industry in levels of production and employment and therefore amended the Act by increasing the allowable foreign value to 70 percent of the total value of the watch. *See* S.Rep. No. 94–279, 94th Cong., 1st Sess., *reprinted in* [1975] U.S. Code Cong. & Admin.News, pp. 884, 884–85.

Under Headnote 6(d) of Schedule 7, Part 2(E) of the Tariff Schedules of the United States, 19 U.S.C. § 1202, as amended, the Secretary of Interior and the Secretary of Commerce are required to "allocate on a fair and equitable basis among producers of watches and watch movements located in the Virgin Islands, Guam, and American Samoa the quotas for each calendar year \* \* \* ." Headnote 6(d) authorizes the Secretaries to "issue such regulations as they determine necessary" to carry out their duties under Headnote 6(d).

The annual allocation rules issued by the departments prior to 1979 set quotas on the basis of three factors: (1) wages paid to local labor, (2) shipments made to the United States, and (3) taxes paid to the insular possessions. *See* 43 Fed.Reg. 60313 (December 27, 1978).

On December 18, 1978, the departments issued a final rule for allocating quotas in 1979 (*see* 43 Fed.Reg. 60313). The 1979 Allocation Rules contemplate a two-stage allocation process. In the first stage, a portion of the 1979 quota will be allocated among all eligible producers on the basis of three factors: (1) local wages paid, (2) units shipped in the prior year, and (3) local income taxes paid. Sixty percent of this portion of the quota will be divided on the basis of relative wage contributions, twenty percent on the basis of shipments made, and twenty percent on the basis of taxes paid.

In contrast to prior rules, the 1979 Allocation Rules provide for the creation of a second stage in the allocation process. In this stage the remainder of the quota, unallocated under the first stage, is divided among assemblers meeting certain minimum requirements. These provisions require the assemblers to:

(1) use at least 26 "discrete components" in the assembly of watch movements; (29 in the case of assembled watches); or

(2) make General Headnote 3(a) wage contributions of $0.75 or more per watch movement ($0.95 in the case of assembled watches).

The factors used in allocating this second-tier quota among assemblers meeting the eligibility requirements are the same as those utilized in the first stage, *i. e.,* wages, taxes, and shipments. 1979 Allocation Rules at 60318. The second-tier requirements must also be met for a producer to receive a "reallocation" of quota.

The preamble to the 1979 rules reaffirms the congressional purpose of favoring the products of insular possessions over direct imports "so long as no domestic industry is harmed by the policy" and of "maximizing the economic contribution to the territories." 1979 Allocation Rules at 60313. In particular, the preamble reflects an intent to discourage "funnel-through" operations.

Plaintiffs contend that the real purpose of these rules is not to stimulate insular development but to discriminate against manufacturers using preassembled Russian parts. The Secretaries' position is that the quota allocations are a fair and equitable means of encouraging a "labor-intensive" mode of production and of discouraging "funnel-through" operations.

Jerlian Watch Company, Inc., an insular watch producer, filed an action in the District Court of Guam seeking declaratory and injunctive relief against the implemen-

tation of the 1979 Allocation Rules.[1] The complaint alleged that the 1979 Rules were arbitrary and capricious, and that procedural deprivations in the rulemaking process invalidated the rules.

The district court, as noted, found that exclusive jurisdiction over the cause of action lay in the Customs Court pursuant to 28 U.S.C. § 1582(a), and dismissed the action for want of jurisdiction.

The Customs Court has exclusive jurisdiction over customs matters. 28 U.S.C. § 1582. Conversely, jurisdiction over customs matters is denied to the district courts by 28 U.S.C. § 1340:

> "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage *except matters within the jurisdiction of the Customs Court.*" (Emphasis supplied.)

Plaintiffs contend that, notwithstanding § 1582(a), jurisdiction over this action lies in the district court pursuant to 28 U.S.C. §§ 1331 or 1340 because the primary purpose of the rules and the statute under which the rules were promulgated relates to a traditionally noncustoms purpose, promoting economic stimulation in the insular possessions. Plaintiffs also contend that even if the primary thrust of the rules relates to a traditional customs purpose, so that jurisdiction would ordinarily lie in the Customs Court to consider their challenge, the absence of an "adequate remedy" in the Customs Court vests jurisdiction over the challenge in the district court. Finally, they assert that the district court erred in refusing to consider proffered evidence relating to their financial destruction, because that evidence was relevant to a determination of whether their Customs Court remedy was adequate. We reject each of these arguments.

I. *Exclusive Customs Court Jurisdiction*

▮ Plaintiffs contend that the district court has subject-matter jurisdiction over a substantive and procedural challenge to the 1979 Allocation Rules because the rules, although peripherally related to imports, do not involve any actions by Customs Service officials and have a primary purpose other than the traditional tariff objectives of raising revenues and controlling the flow of imported goods into the United States. They rely strongly on *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976).

*Algonquin* was an action in the district court against the Secretary of the Treasury, challenging the President's authority under the Trade Expansion Act, 19 U.S.C. § 1862, to impose certain license fees on imported oil. The jurisdictional issue was addressed only in an unpublished opinion by the district court, and not by either the Supreme Court or circuit court opinions. *See Algonquin SNG, Inc. v. Federal Energy Administration,* 171 U.S.App.D.C. 113, 128, 518 F.2d 1051, 1066 (1975), *rev'd,* 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976).

In *Algonquin,* the district court determined that the license fee system promulgated by the President pursuant to his authority under 19 U.S.C. § 1862(b) "to adjust the imports of [oil] and its derivatives so that such imports will not so threaten to impair the national security" was not a tariff or duty within the intent of 28 U.S.C. § 1582(a)(2). The court determined that the fee was not substantively grounded on the customs laws, but was a " 'regulatory measure enacted for the protection of national security.' " Therefore jurisdiction was predicated, not on 28 U.S.C. § 1582(a)(2), but on 28 U.S.C. §§ 1331 or 1340.

*Algonquin* is consistent with those cases which look, not to the method, but to the purpose of the statute. *See, e. g., Precise Imports Corp. v. Kelly,* 218 F.Supp. 494 (S.D.N.Y.1963), *aff'd,* 378 F.2d 1014 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); *Croton Watch Co. v.*

---

1. Cornavin, V. I., Inc., Sussex Watch Corporation, and Waltham Watch Company of the Virgin Islands, Inc. intervened as plaintiffs.

*Laughlin*, 208 F.2d 93 (2d Cir. 1953). In each of these cases, the purposes of the challenged. statutes were other than customs purposes, and the statutes were found not to be a part of the customs laws. Thus exclusive jurisdiction did not lie in the Customs Court.

The present case is distinguishable from the *Algonquin* line of cases because the 1979 Allocation Rules have a substantial relation to traditional customs purposes, *i. e.,* protection of domestic industry from foreign competition and the raising of revenues, even though the rules also have the concurrent purpose of promoting insular economic development. Both the legislative history of Public Law 89–805 and the preamble to the 1979 Allocation Rules reflect the substantial purpose of protecting domestic industry by discouraging "funnel-through" operations. *See* S.Rep. No. 1679, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 4389, 4395–96; 43 Fed.Reg. 60313. And, viewed as a whole, the statute and rules merely provide for a partial exemption from duties normally imposed on foreign goods. *See* General Headnote 3(a) of the Tariff Schedules of the United States, 19 U.S.C. § 1202. Thus it is apparent that the customs purpose is not peripheral and that plaintiffs' challenge to the 1979 Allocation Rules is. one directed at "the classification and rate and amount of duties chargeable" under the Tariff Act of 1930, as amended. Therefore, jurisdiction is exclusively vested in the Customs Court pursuant to 28 U.S.C. § 1582(a).

Our decision is guided by the intent of Congress. In enacting 28 U.S.C. § 1582, Congress intended that matters involving customs laws should be heard by one tribunal so that uniformity of decision would result. *J. C. Penney Co. v. U. S. Treasury Department*, 439 F.2d 63, 66 (2d Cir.), *cert. denied*, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *see also Fritz v. United States*, 535 F.2d 1192, 1194 (9th Cir. 1976); *Sneaker Circus, Inc. v. Carter*, 566 F.2d 396, 399 (2d Cir. 1977). If the district court should have jurisdiction over this type of action, inconsistent district and circuit court opinions on both jurisdictional and substantive revenue

and protection claims would result. Moreover the Customs Court would be denied jurisdiction in the greatest area of its expertise. We do not believe that Congress intended these results.

## II. *Adequate Remedy*

■ A narrow exception to exclusive Customs Court jurisdiction exists where plaintiffs have no "adequate remedy" in Customs Court. *See, e. g., Sneaker Circus, Inc. v. Carter*, 566 F.2d at 399. Where no adequate remedy exists, jurisdiction lies in the district court to consider the challenge. 566 F.2d at 399.

■ Plaintiffs assert that they come within the "remedy" exception to Customs Court jurisdiction because, while it is theoretically possible for them to pursue an administrative remedy by importing more than their duty-free quota allocation, paying the duties assessed, and then suing for a refund under 19 U.S.C. § 1514(a), it is practically impossible for them to do so. They contend that if the 1979 Rules are allowed to go into effect, they will be forced out of business and thus will be unable to pursue the administrative remedy provided in § 1514(a).

In arguing that the "adequate remedy" exception applies, plaintiffs strongly rely on *Sneaker Circus, Inc. v. Carter, supra,* and *Davis Walker Corp. v. Blumenthal*, 460 F.Supp. 283 (D.D.C.1978). Both cases are distinguishable.

In *Sneaker Circus*, retailers, wholesalers, and importers of footwear sought injunctive and declaratory relief to invalidate certain U.S. trade agreements with the Republic of Korea and the Republic of China, which were negotiated pursuant to the Trade Act of 1974, 19 U.S.C. § 2101. The agreements limited the quantity of footwear exported from these two countries and were enforced by sanctions imposed by the foreign governments. The court found:

"  *  *  *  There is accordingly every likelihood that the agreements will be effectively enforced abroad, with the result that no occasion for protest under

section 514 will ever present itself, and no Customs Court jurisdiction under 28 U.S.C. § 1582 will arise. The point is not that the dispute is not presently ripe for adjudication in the Customs Court, but rather that the case will never ripen sufficiently to meet the statutory requirements for jurisdiction * * *." 566 F.2d at 399–400.

*See also Timken Co. v. Simon*, 176 U.S.App. D.C. 219, 224, 539 F.2d 221, 226 n.7 (1976).

In *Davis Walker Corp. v. Blumenfeld*, the court reached the same conclusion when faced with another instance of private enforcement abroad. In that case purchasers of steel wire rod sought declaratory and injunctive relief with respect to the "trigger price mechanism" (TPM) under the Anti-Dumping Act, 19 U.S.C. §§ 160–173. The court found that there was a "strong likelihood" that plaintiffs could not obtain review in the Customs Court because foreign suppliers refused to sell steel wire at prices below the trigger prices while the TPM was in effect. The court stated:

"* * * If the TPM is reinstituted in respect to steel wire rod and most foreign suppliers refuse to sell steel wire rod below the trigger prices, then an antidumping investigation will probably not be initiated, dumping duties will not be imposed, and judicial review in the Customs Court will not be available * * *." 460 F.Supp. at 290.

In contrast to these cases, plaintiffs here are not barred from access to the Customs Court by an uncontrollable third party's action or by private enforcement abroad. Instead, they hold the key to their remedy by choosing whether or not to import in excess of their allocation and pursue a protest under 19 U.S.C. § 1514(a).

Plaintiffs' allegations of financial impossibility, even if accepted as true, do not place them within the "adequate remedy" exception. The dispositive consideration in determining whether plaintiffs have an adequate remedy is the nature of the barrier and not its financial height. Any financial barrier is inherent in the system established by Congress, and must have been recognized by Congress when it enacted 19 U.S.C. § 1514(a). It is true that injunctive and declaratory relief is a more desirable remedy in plaintiffs' view, but "the mere fact that more desirable remedies are unavailable does not mean that existing remedies are inadequate." *J. C. Penney Co. v. U. S. Treasury Department*, 439 F.2d at 68.

If we were to hold that financial impossibility placed plaintiffs within the "adequate remedy" exception to Customs Court jurisdiction, we would be carving out a large exception to Customs Court jurisdiction that Congress did not intend in providing for the uniform administration of the customs laws. Such a holding would allow for inconsistent district and circuit court opinions on both jurisdictional and substantive issues. Expanding the exception would not enhance judicial efficiency. Forum-shopping would be encouraged and district courts would be required to hold "minitrials" on the issue of financial impossibility in order to determine their own jurisdiction. We decline to follow this path. We hold that plaintiffs have an adequate remedy available to them. Further, because of our holding that financial hardship is irrelevant to a determination of whether an adequate remedy exists, we conclude that the district court did not err in refusing to hear such evidence.

The decision of the district court is affirmed. Plaintiffs' motion for an injunction pending appeal is denied as moot. The government defendants' motions for the return of documents are granted. Neither party is to recover costs.