**HENRY POLLAK, INC., Plaintiff,**

v.

**W. Michael BLUMENTHAL, Secretary of the Treasury, et al., Defendants.***

**Civ. A. No. 77–1177.**

United States District Court,
District of Columbia.

Nov. 23, 1977.

* Consolidated with the following; in which W. Michael Blumenthal is the Defendant:

R. L. Albert & Son, Inc., 77–1449; Morse Shoe, Inc., 77–1479; May Dept. Stores Co., 77–1480; Peters Bag Corp., 77–1481; Ball Machinery Co., 77–1505; Andrew Fisher Cycle Co., Inc., 77–1519; K. Gimbel Accessories, Inc., 77–1520; Avco Aerostructures Div., 77–1521; Jimlar Corp., 77–1522; Garay & Co., Inc., 77–1523; Lockheed California Corp., 77–1526; Galdi Industries, Inc., 77–1578; Domestic Broom & Brush Co., Inc., 77–1579; I & S Bedspread, Inc., 77–1580; Avins Industrial Products Corp., 77–1630; Electronic Memories and Magnetics Corp., 77–1660; Industrial Tube Corp., 77–1661; Mobay Chemical Corp., 77–1728; Alexander's, Inc., 77–1802; Mobilite, Inc., 77–1847; Brown Boveri Corp., 77–1920; and Sumitomo Shoji America, Inc., 77–1946.

Wender, Murase & White, Barnes, Richardson & Colburn, Washington, D. C., for plaintiff.

Bruno Ristau, Asst. U. S. Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

Plaintiffs in these actions sue for the return of funds collected from them by defendants, who acted in accord with Presidential Proclamation No. 4074, issued August 15, 1971. Proclamation No. 4074 imposed a surcharge upon articles imported into the United States and subjected to customs duties. Defendants have moved the Court under F.R.Civ.P. 12(b)(1) to dismiss the complaints on the ground that the Court lacks jurisdiction over the subject matter. The Court grants defendants' motion for the reasons given below.

### I.

During the summer of 1971, the United States was faced with an economic crisis.[1] The nation suffered under an exceptionally severe and worsening balance of payments deficit. The gold reserve backing of the U. S. dollar had dropped from $17.8 billion in 1960 to less than $10.4 billion in June of 1971, reflecting a growing lack of confidence in the U. S. dollar abroad. Foreign exchange rates were being controlled by some of our major trading partners in such a way as to overvalue the U. S. dollar. That action, by stimulating U. S. imports and restraining U. S. exports, contributed substantially to the balance of payments deficit. As one step in a program designed to meet the economic crisis, the President issued Proclamation 4074, which was entitled *Imposition of Supplemental Duty for Balance of Payment Purposes* and stated in relevant part:

WHEREAS, there has been a prolonged decline in the international monetary reserves of the United States, and our trade and international competitive position is seriously threatened and, as a result, our continued ability to assure our security could be impaired;

WHEREAS, the balance of payments position of the United States requires the imposition of a surcharge on dutiable imports;

.   .   .   .   .

NOW, THEREFORE, I, RICHARD NIXON, President of the United States of America, acting under the authority vested in me by the Constitution and the statutes, including, but not limited to, the Tariff Act [of 1930], and the TEA [Trade Expansion Act of 1972], respectively, do proclaim as follows:

A. I hereby declare a national emergency during which I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States.

B. (1) I hereby terminate in part for such period as may be necessary and modify prior Presidential Proclamations which carry out trade agreements insofar as such proclamations are inconsistent with, or proclaim duties different from, those made effective pursuant to the terms of this Proclamation.

(2) Such proclamations are suspended only insofar as is required to assess a surcharge in the form of a supplemental duty amounting to 10 percent ad valorem. Such supplemental duty shall be imposed on all dutiable articles imported into the customs territory of the United States

.   .   .   .

The Proclamation went on to delegate broad discretion to the Secretary of the

---

1. This account of the economic and political circumstances which preceded issuance of the Proclamation is borrowed verbatim from *United States v. Yoshida Intern., Inc.*, CCPA, 526 F.2d 560 (1975).

Treasury to conduct the surcharge program, including power to reduce or entirely eliminate the surcharges on any or all articles if he felt the balance of payments situation had changed. The Secretary was authorized also to prescribe rules and regulations to carry out his responsibilities.

On December 20, 1971, a little over four months after the surcharges went into effect, President Nixon issued Proclamation No. 4098 terminating the program. The reason given was the formulation of a multilateral agreement among the major industrial nations which alleviated the balance of payments problem.

Following payment of the surcharges, a number, although presumably not all, of the plaintiffs in the cases before us filed protests with the United States Customs Service pursuant to 19 U.S.C. § 1514. That statute, part of the Tariff Act of 1930, as amended, permits administrative review of decisions by a customs officer, including "the legality of all orders and findings entering into" such decisions. The subject matter of the decisions covered by 19 U.S.C. § 1514 is defined to include "the classification and rate and amount of duties chargeable" and "all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury." Apparently a large number of protests against the surcharges were lodged, having similar thrusts; they raised the question of the President's constitutional authority to impose the surcharges.

One importer, Yoshida International, Inc., filed suit in the U. S. Customs Court upon denial of its administrative protest. The statute defining the jurisdiction of the Customs Court provides,

(a) The Customs Court shall have exclusive jurisdiction of civil actions instituted by any person whose protest pursuant to the Tariff Act of 1930, as amended, has been denied, in whole or in part, by the appropriate customs officer, where the administrative decision, including the legality of all orders and findings entering into the same, involves: . . . (2) the classification and rate and amount of duties chargeable; (3) all charges and exactions of whatever character within the jurisdiction of the Secretary of the Treasury . . . . 28 U.S.C. § 1582.

The language of this statute, it will be noted, tracks the language setting out the subject matter of 19 U.S.C. § 1514, and provides for judicial review of the administrative decisions made under that provision.

In view of Yoshida's suit joining the issue of the President's authority to impose the surcharge by proclamation, Congress passed Section 611 of the Trade Act of 1974, P.L. 93–618, 88 Stat. 2075. Entitled *Review of Protests in Import Surcharge Cases*, the provision provided that "in the case of any protest . . . involving the imposition of an import surcharge in the form of a supplemental duty pursuant to Presidential Proclamation 4074", the time for administrative review of the protest was extended to five years from the date the protest was first filed. The protests filed by various plaintiffs in the cases now before this Court were among those held up pending the outcome of the Yoshida litigation.

On November 6, 1975—within the period of the five-year freeze imposed by Section 611—the United States Court of Customs and Patent Appeals reversed a decision of the Customs Court and found the import surcharge program to have been a valid exercise of Presidential authority, on the ground that Congress had provided to the President an appropriate statutory delegation of the Congressional power to regulate Commerce. *United States v. Yoshida Intern., Inc.*, CCPA, 526 F.2d 560 (1975). On June 3, 1976, the Court of Customs and Patent Appeals ruled against a second importer who had filed an identical suit in Customs Court, on the grounds that *Yoshida* and the principle of *stare decisis* disposed of the case despite the fact that different goods were involved. *Alcan Sales v. United States*, CCPA, 534 F.2d 920 (1976). The Supreme Court denied certiorari in the *Alcan* case on November 29, 1976, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598, and the question of the validity of the surcharge program would seem to have been settled.

## II.

Nevertheless, plaintiffs in the instant cases have initiated a new wave of litigation in the federal district court, seeking to undo all the jurisprudence crafted by the Court of Customs and Patent Appeals. Their argument for district court jurisdiction grows out of their reading of *Yoshida*. *Yoshida* declared that the Congressional delegation of surcharge authority to the President was included not in any statutes explicitly denominated as trade statutes, such as the Trade Act of 1930 or the Trade Expansion Act of 1962, but in the Trading with the Enemy Act, 50 U.S.C.App. 1 *et seq.*. Since the bulk of litigation arising under the TWEA comes into the district courts, plaintiffs assert that their challenge to the surcharge program belongs here, too. This amounts to a contention that Yoshida should not have filed its suit in the Customs Court, that the Customs Court should not have accepted jurisdiction, that the Court of Customs and Patent Appeals erred in reaching the merits of the challenge to the import surcharge program, that it erred a second time in adjudicating the *Alcan* case, and that Congress erred in holding up administrative protests pending completion of the *Yoshida* litigation. Since both Congress and the Court of Customs and Patent Appeals are authoritative sources of wisdom regarding Customs Court jurisdiction, and since the Supreme Court has chosen not to speak on the matter, plaintiffs ask too much of this tribunal in claiming the right to come before it. However, ambiguities in the jurisdictional lines between the Customs Court and the district courts and in the implications to be drawn from *Yoshida* merit brief clarification.

Plaintiffs argue that the TWEA is not considered a customs law, and that the district courts ordinarily have taken jurisdiction of questions arising under the Act. Assuming, therefore, that the *Yoshida* court was correct in locating the pertinent Congressional delegation of authority within the TWEA, it should follow that the merits of the delegation question can be argued all over again, this time in the district court.

As defendants point out in their brief, the TWEA, as originally enacted in 1917, was strictly a war measure. Its purpose was to prohibit trade with wartime enemies and to authorize the President to seize enemy-owned property, administer it for the benefit of the United States, and dispose of it as Congress might direct.

Then, during the economic crisis of the 1930's, Section 5(b) of the Act, 50 U.S.C. App. 5(b), was selected by Congress as a convenient foundation upon which to fashion a broad delegation to the President of peacetime regulatory power over the economy. At the outbreak of World War II, the President's 5(b) powers were enlarged still further to authorize control, during either war or periods of declared national emergency, of all property in the United States owned by any foreign nation or citizen, friendly or otherwise. Thus, by 1941 the title of 50 U.S.C.App. 1 *et seq.* was a misnomer; Section 5(b) of the Act permitted the President, among other things, to "regulate" the "importation" of "any property" in which "any foreign country" had "any interest." This was the crucial language in the *Yoshida* decision.

Authority as broad as this permits the President to involve himself in a range of economic regulation, some of which would involve matters within the purview of the district courts and some within the exclusive jurisdiction of the Customs Court. That many matters arising under the TWEA, and under Section 5(b) in particular, are adjudicated by the district courts is beside the point; the issue is where litigation involving the import surcharge program in particular belongs.[2]

2. It follows that plaintiffs' reliance upon Section 9(a) of the Trading with the Enemy Act, 50 U.S.C.App. 9(a), to buttress its jurisdiction argument is without merit. Section 9(a) was enacted in 1917 to serve as a companion to the original version of Section 5(b). When Section 5(b) was amended in the 1930's and in 1941 to apply to situations involving not only alleged enemies but also peacetime periods of national emergency and business involvements with foreign nations in general, Section 9(a) was not modified to keep it pertinent to these situa-

It should be noted, first, that Presidential Proclamation 4074 levied "supplemental" charges upon articles already "dutiable." The structure of duties upon which the supplemental charges were superimposed are set out in the Tariff Schedules of the United States, whose limits are specifically legislated by Congress and whose administration is in the hands of the Bureau of Customs of the Treasury Department. The "protest" procedure of 19 U.S.C. § 1514, described previously, exists for the handling of challenges to the Tariff Schedules. As indicated above, not only does the procedure cover protests against the "amount of duties chargeable" and "all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury," it also anticipates challenges to "the legality of all orders . . . entering into" decisions of customs officers. The language of 28 U.S.C. § 1582, which sets out the jurisdiction of the Customs Court, tracks the quoted language exactly, thereby providing judicial review of administrative dispositions of protests.

The plain words of 28 U.S.C. § 1582 indicate that litigation involving the surcharge program belongs in the Customs Court. Moreover, given the unquestionable allocation to the Customs Court of challenges to the Tariff Schedules, including issues of their underlying constitutionality, see *J. C. Penney Company v. United States Treasury Dept.*, 439 F.2d 63, 65–67 (1971), it would be nonsensical to conclude that challenges to a program of surcharges built upon the Schedules should be matters within the jurisdiction of a different court:

> [P]roper administration of the customs laws requires a complete, integral, smooth-functioning system of customs law justice. Such an end could not be accomplished if customs issues were fractionalized so that the district courts deal with certain issues arising out of customs controversies while the Customs Court concerns itself with the remaining customs issues. *Penney, supra* at 66.

Apart from the inherent logic of restricting any further litigation over the surcharge program to the Customs Court, it should be noted that Congress recognized the jurisdiction of the customs court system over challenges to the surcharge program in its passage of Section 611 of the Trade Act of 1974, cited earlier. The Senate Finance Committee, which originated Section 611, referred to the *Yoshida* litigation in its Report on the Bill:

> This extension [for the processing of protests] would, in effect, represent a limited amendment to section 515(a) of the Tariff Act of 1930. The surcharge under the above Presidential Proclamation 4074 was recently found in the Customs Court to be void as an ultra vires act on the part of the President. That decision was subsequently appealed. This section would permit the resolution of that appeal and any subsequent appeals without denying the thousands of protests already made. 1974 *U.S.Code Cong. and Admin.News* at 7363.

Congress having acknowledged the authority of the Customs Court over the surcharge program as the basis for amending national legislation, this Court has no hesitation in according the same deference to the Customs Court on the question of jurisdiction. The Court cannot help noticing, in addition, that the quoted provision suggests Congress' expectation that the *Yoshida* litigation would serve as a dispositive test case on the merits of the surcharge issue.

Plaintiffs' argument that the surcharge program should not be characterized as a customs matter because of its genesis in the Trading with the Enemy Act is undermined further by consideration of Section 122 of the Trade Act of 1974. That provision, now codified as 19 U.S.C. § 2132, authorizes the President specifically to impose temporary import surcharges whenever "fundamental international payments problems" require

---

tions. It is obvious on its face that 9(a) confers jurisdiction upon the federal district courts only to consider challenges to the wartime applications of Section 5(b) and to identifications

of parties as "enemies". Section 9(a) is not relevant to those portions of Section 5(b) which empower the President to regulate foreign trade during peacetime.

them. The Senate Report on the Bill justified the need for the provision "in the light of the recent decision by the United States Customs Court which held that the 10 percent surcharge . . . was without advance authority." 1974 *U.S.Code Cong. and Admin.News* at 7237. In the face of a Congressional determination that a grant of explicit surcharge authority belonged within the Trade Act of 1974, plaintiffs cannot argue convincingly that a decision of the judiciary in 1975, to the effect that general authority for the 1971 program rested in the TWEA, establishes the essential character of a surcharge program as involving something other than customs and trade matter.

In summary, this Court's consideration of the plain wording of the statute defining the jurisdiction of the Customs Court, of the close kinship between the country's basic tariff schedules and the surcharges superimposed on them, and of Congress' treatment of the *Yoshida* litigation convinces it that the Customs Court was correct in taking jurisdiction of challenges to the surcharge program. It follows from the provision for exclusivity in 28 U.S.C. § 1582 that this Court does not have jurisdiction. These conclusions are not affected by the possibility that some of the present plaintiffs before the Court might not have filed protests against the surcharge and thus have perfected their jurisdictional standing in a timely manner. The right to file a protest was well-established and was utilized by thousands of importers. This Court will not provide a remedy for parties who were lax in taking advantage of their appropriate legal rights.