**CORNET STORES et al.,
Plaintiffs/Appellants,**

v.

**Azie Taylor MORTON, Treasurer of the
United States, et al.,
Defendants/Appellees.**

No. 78–3183.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1980.

Decided Nov. 6, 1980.

Robert Glenn White, Glad, Tuttle & White, Los Angeles, Cal., for plaintiffs/appellants.

Bruno A. Ristau, U. S. Dept. of Justice, Washington, D. C., for defendants/appellees.

Before SCHROEDER and FERGUSON, Circuit Judges, and MacBRIDE,* District Judge.

MacBRIDE, District Judge.

Between August 16, 1971 and December 20, 1971, pursuant to Presidential Proclamation No. 4074, plaintiffs were required to pay an additional 10 percent *ad valorem* duty on the dutiable merchandise they imported into the United States. The validity of that Proclamation was tested in *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A.1975), and *Alcan Sales v. United States*, 534 F.2d 920 (C.C.P.A.), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). The Court of Customs and Patent Appeals upheld the imposition of this import duty surcharge as an exercise of the power delegated to the President by section 5(b) of the Trading with the Enemy Act, 50 U.S.C. App. § 5(b).[1] In the wake of *Yoshida* and *Alcan*, plaintiffs sued in the district court for recovery of the import surcharges they had paid, relying primarily on the jurisdictional provisions of section 9 of that Act. The district court held that the matter was within the exclusive jurisdiction of the Customs Court. Plaintiffs appeal; we affirm. This court finds itself in accord with the conclusion reached by the only other court to address the precise issue presented. *Henry Pollak, Inc. v. Blumenthal*, 444 F.Supp. 56 (D.D.C.1977), *aff'd mem.*, 593 F.2d 1371 (D.C.Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

Originally enacted as a war measure during the First World War, Act of Oct. 6, 1917, ch. 106, 40 Stat. 415, section 5(b) of the Act was amended during the Depression to accord comprehensive power in connection with foreign trade and commerce to the President during peacetime emergencies. Act of Mar. 9, 1933, ch. 1, § 2, 48 Stat. 1. The authority granted in the 1933 amendment to section 5(b) was not limited in scope to circumstances involving enemies or allies of enemies. Instead, the powers granted in amended section 5(b) were intended to be exercised in peacetime to enable the President to engage in extensive regulation of international economic transactions when a national emergency so required. In fact, whatever Congress may have contemplated in 1933, section 5(b) became the foundation for far–ranging and long–term executive regulatory activity between 1933 and the late 1970s. The national banking emergency declared by President Roosevelt in 1933, Executive Order No. 6260, *reprinted following* 12 U.S.C. § 95a, and a number of subsequently declared national emergencies were terminated only by operation of the National Emergencies Act of 1976, 50 U.S.C. § 1601 *et seq.* As a result of the continuing state of national emergency, the powers granted in section 5(b) remained available to the President for more than 40 years without interruption.

Although section 5(b) was significantly amended in 1933, other sections of the Trading with the Enemy Act were not concurrently amended and, for that reason, retain original limitations. In particular, the claims procedures and judicial review accorded under section 9 of the Act to persons who are not enemies or allies of enemies have no application to those purely

---

* Honorable Thomas J. MacBride, United States District Judge for the Eastern District of California, sitting by designation.

1. During 1971 when Presidential Proclamation No. 4074 was in effect and for some years thereafter, section 5(b) provided in part:

   (1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise–

   (B) investigate, regulate, ... prevent or prohibit, any ... importation or exportation of ... any property in which an foreign country or a national thereof has any interest,

   by any person, or with respect to any property, subject to the jurisdiction of the United States ....

   Section 5(b) was amended in 1977, Act of Dec. 28, 1977, Pub.L. No. 95–223, tit. I, §§ 101(a), 102, 103(b), 91 Stat. 1625, 1626, but the amendment is not pertinent to the issues presented in this litigation.

peacetime powers created when section 5(b) was amended. Section 9(a) sets forth an administrative scheme through which eligible persons may seek recovery of property seized under the Act; if relief is initially denied, the claimant is accorded the right to sue in district court. The section 9(a) remedy is available for persons

> claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States . . . .

50 U.S.C. App. § 9(a).

■ Although the language of section 9(a) could, with some difficulty, be construed to grant jurisdiction to the district courts to hear actions for recovery of import and export duties imposed pursuant to the peacetime powers of section 5(a),[2] such a construction would violate the congressionally designated allocation of judicial responsibility over customs matters. Pursuant to 28 U.S.C. § 1582, the Customs Court is granted exclusive jurisdiction over customs matters. The clear congressional intent to place such jurisdiction solely in the Customs Court is reinforced by 28 U.S.C. § 1340 which expressly denies to the district courts jurisdiction over "matters within the jurisdiction of the Customs Court." *Jerlian Watch Co. v. United States Department of Commerce*, 597 F.2d 687, 690 (9th Cir. 1979).

Published opinions reveal a number of instances in which creative arguments have been presented in hopes of avoiding the exclusivity of Customs Court jurisdiction. *E. g., id.; Fritz v. United States*, 535 F.2d 1192 (9th Cir. 1976); *J.C. Penney Co. v. United States Treasury Department*, 439 F.2d 63 (2d Cir.), *cert. denied*, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *Riccomini v. United States*, 69 F.2d 480 (9th Cir.

1934). These arguments have been rejected with exceptions only for unusual circumstances as, for example, when activities outside the United States created a situation in which the events triggering Customs Court jurisdiction under section 1582 would not occur. *E. g., Sneaker Circus, Inc. v. Carter*, 566 F.2d 396 (2d Cir. 1977); *Timken Co. v. Simon*, 539 F.2d 221 (D.C.Cir.1976); *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136 (D.C.Cir.), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2406, 44 L.Ed.2d 673 (1974). The rule repeatedly applied in the Ninth Circuit is that "[c]onflicts between the broad grants of jurisdiction to the district courts and the grant of exclusive jurisdiction to the Customs Court are to be resolved by upholding the exclusivity of the Customs Court jurisdiction." *Fritz v. United States, supra* at 1194.

■ The recent decision in *Jerlian Watch Co. v. United States Department of Commerce, supra*, is most directly applicable to the arguments raised by plaintiffs herein. In *Jerlian*, plaintiff–watch manufacturers sought to challenge the validity of allocation rules governing the entry of duty–free watches from the insular possessions of the United States. They urged that jurisdiction might properly lie in the district courts because the challenged rules and the statute under which they were promulgated primarily served "a traditionally noncustoms purpose, promoting economic stimulation in the insular possessions," and because the absence of an adequate remedy, namely, injunctive and declaratory relief, in the Customs Court necessitated recognition of district court jurisdiction. This court flatly rejected those arguments. Although *Jerlian* acknowledged that exclusive jurisdiction will not lie in the Customs Court when "the purposes of the challenged statutes [are] other than customs purposes, and the statutes [are] found not to be a part of the

---

**2.** Two obvious impediments to an attempt to construe section 9(a) as a grant of peacetime jurisdiction in a case such as is before this court appear in the grant of jurisdiction to "[a]ny person not an enemy or ally of enemy" and in the type of property at issue, namely, property in the hands of the Alien Property

Custodian. Neither of these references in the language of the section can be readily deemed applicable to circumstances in which the plaintiffs are importers of dutiable merchandise who were required to pay an import surcharge. *See generally Henry Pollak, Inc. v. Blumenthal, supra*.

customs laws," the court held that the allocation rules had a substantial relation to traditional customs purposes, namely, "protection of domestic industry from foreign competition and the raising of revenues." *Id.* at 691. Under these circumstances, congressional intent mandated that the action be brought in the Customs Court:

> In enacting 28 U.S.C. § 1582, Congress intended that matters involving customs laws should be heard by one tribunal so that uniformity of decision would result. If the district court should have jurisdiction over this type of action, inconsistent district and circuit court opinions on both jurisdictional and substantive revenue, and protection claims would result. Moreover the Customs Court would be denied jurisdiction in the greatest area of its expertise. We do not believe that Congress intended these results.

*Id.* (citations omitted). This policy of uniform administration of customs laws also defeated the plaintiffs' contention that financial impossibility precluded obtaining an adequate remedy in the Customs Court. As the *Jerlian* court noted, an "adequate remedy" exception to the exclusive jurisdiction of the Customs Court does exist in instances of *factual* impossibility, but the court declined to expand the exception to include financial impossibility. Although injunctive and declaratory relief might be more desirable remedies, " 'the mere fact that more desirable remedies are unavailable does not mean that existing remedies are inadequate.' " *Id.* at 692, *quoting J.C. Penney Co. v. United States Treasury Department, supra* at 68.

*Jerlian* controls the resolution of this appeal. There, as here, plaintiffs sought to define too narrowly the scope of the customs matters within the exclusive jurisdiction of the Customs Court and to label legally inadequate a Customs Court remedy that is merely undesirable or inconvenient.

■ The preamble to Proclamation 4074 sets forth as grounds for the surcharge the declarations that

> there has been a prolonged decline in the international monetary reserves of the

United States, and our trade and international competitive position is seriously threatened and, as a result, our continued ability to assure our security could be impaired; [and] the balance of payments position of the United States requires the imposition of a surcharge on dutiable imports . . . .

As the Court of Customs and Patent Appeals concluded in *United States v. Yoshida International, Inc., supra,* the principal purpose of the surcharge was the regulation of imports.

> What was sought was an offset to actions of our foreign trading partners which had led to loss of our favorable balance of trade and to a serious negative balance . . . . Pressure exerted by the surcharge contributed to achievement of a multilateral agreement of major nations, which included a realignment of currency exchange rates.

*Id.* at 579 (footnote omitted). Appellants contend that the duty imposed by Proclamation 4074 differs significantly from traditional customs duties whose purposes are, in appellants' view, to raise revenue or to protect American industry. Viewed liberally, of course, Proclamation 4074 was significantly founded on the need to protect American industry as a whole from the unsatisfactory trade and international competitive position created by the decline in international monetary reserves. The Proclamation clearly furthered multiple purposes, with national security and customs purposes standing out as the most prominent. Customs Court jurisdiction is not defeated because a statute or regulation serves other ends in addition to recognized customs purposes, so long as there exists "a substantial relation to traditional customs purposes." *Jerlian Watch Co. v. United States Department of Commerce, supra* at 691. Proclamation 4074 was intended to be a customs regulation at the time of its promulgation, as evidenced by its references to the Tariff Act of 1930 and the Trade Expansion Act of 1962, and its directives were fulfilled through the existing

scheme for the collection of customs duties.[3] As in *Jerlian*, the presence of a substantial relation to the traditional customs purposes mandates that jurisdiction rest in the Customs Court pursuant to 28 U.S.C. § 1582.

■ Plaintiffs seek to avoid exclusive Customs Court jurisdiction by arguing that the Customs Court cannot provide equitable remedies such as injunctive and declaratory relief and cannot afford litigants the benefit of such equitable doctrines as the tolling of the statute of limitations. The fact that Congress has not chosen to empower the Customs Court to grant the full measure of equitable relief available in the district courts is not a basis for abrogating the exclusivity of Customs Court jurisdiction. *Jerlian Watch Co. v. United States Department of Commerce, supra* at 692. Recognition of an exception based on the inconvenience or undesirability of litigation in a court lacking full equitable powers would defeat congressional intent to ensure uniform administration and application of the customs laws embodied in 28 U.S.C. § 1582 and other statutes allocating jurisdiction between the district courts and the Customs Court. Accordingly, we reject plaintiffs' argument that the Customs Court cannot provide a legally adequate remedy.

The decision of the district court is AFFIRMED.

---

**3.** · Customs duties have historically been imposed in furtherance of a wide variety of economic and other purposes. For example, 19 U.S.C. § 128, enacted in 1913, imposes a discriminating 10 percent *ad valorem* surcharge on all goods imported into the United States on the flag vessels of other nations unless a treaty permits entry not subject to the duty, unless the vessel is owned by United States citizens and is reregistered under the United States flag before leaving port, or unless the goods are imported from a country contiguous to the United States in the usual course of strictly retail trade. The exception granted to goods transported in a flag vessel of a foreign nation which is owned by United States citizens and reregistered in this country serves no traditional customs purpose in the limited definition of *the traditional customs purposes cited by plaintiffs*. It did, however, encourage an increase in the United States merchant fleet in the worsening international climate prior to World War I. *See also* 19 U.S.C. § 1338 (authorizing imposition of additional duties on articles imported from countries found by the President to have placed a burden or disadvantage upon the commerce of the United States); *19 U.S.C. § 2561 et seq.* (authorizing the President to provide duty–free treatment for eligible articles from certain developing nations in furtherance of their economic development).