**ALCAN SALES, DIV. OF ALCAN ALUMINUM CORP., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 81–121.**
**Court No. 77–8–01685.**

United States Court of International Trade.

Dec. 29, 1981.

Barnes, Richardson & Colburn, New York City (David O. Elliott, Rufus E. Jarman, Jr., and Michael A. Johnson, New York City, at oral argument and on the brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Branch Director, Commercial Litigation Branch and Joseph I. Liebman, Atty. in Charge, Commercial Litigation Branch, New York City, at oral argument and on the brief), for defendant.

BOE, Judge:

It, indeed, is an illustrative exercise in the art of jurisprudential survival that the surcharge issue contained in the instant action, first, having been the subject matter of litigation presented to this court and the appropriate appellate forums,[1] thence the subject matter of litigation presented to the U. S. District Court, District of Columbia,[2] and the U. S. District Court for the Central District of California[3] and their respective appellate forums, emerges again in the present proceedings.

Due to the passage of time since this issue was originally before this court, the following facts are reviewed.

On August 15, 1971, the President in declaring a national emergency "* * * to strengthen the international economic position of the United States" issued Presidential Proclamation 4074 assessing· a surcharge in the form of a supplemental duty in the amount of 10% on all imported dutiable merchandise except certain merchandise specifically exempted therefrom.[4] The 10% surcharge was terminated on December 20, 1971, by Presidential Proclamation 4098 (36 Fed.Reg. 24201 (1971)). The subject merchandise in the instant action was imported into the United States from Canada and entered on November 30, 1971. Upon liquidation a protest was filed by the plaintiff and a denial thereof was made by the Customs Service. A summons was timely filed in this court.

The plaintiff in the instant action does not challenge the prior decision of the CCPA in *United States v. Yoshida International*, 63 CCPA 15, 526 F.2d 560 (1975), in which it was determined that Presidential Proclamation 4074 was a valid exercise of the authority granted to the President by the Congress in section 5(b) of the Trading With the Enemy Act, 50 U.S.C. app. section 5(b) to regulate imports. Predicating its claim, however, under section 9(a) of the Trading With the Enemy Act (TWEA), plaintiff now seeks recovery of the supplemental duty paid by it together with interest. The fact that it neither was nor is an enemy or ally of an enemy of the United States as defined in section 2 of the TWEA, plaintiff contends, causes the retention of the surcharge paid by it to be an unlawful "taking" and, accordingly, recoverable in this proceeding.

In bar to plaintiff's claim, the defendant asserts four principal defenses: (1) lack of

---

**1.** *Yoshida International v. United States*, 73 Cust.Ct. 1, 378 F.Supp. 1155 (1974), *rev'd.*, 63 CCPA 15, 526 F.2d 560 (1975); *Alcan Sales v. United States*, 63 CCPA 83, 534 F.2d 920 (1976), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976).

**2.** *Henry Pollack v. Blumenthal*, 444 F.Supp. 56 (D.D.C.1977), *aff'd. mem.*, 593 F.2d 1371 (D.C. Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

**3.** *Cornet Stores v. Morton*, 632 F.2d 96 (9th Cir. 1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981).

**4.** Presidential Proclamation 4074 in relevant part stated:

WHEREAS, there has been a prolonged decline in the international monetary reserves of the United States, and our trade and international competitive position is seriously threatened and, as a result, our continued ability to assure our security could be impaired;

WHEREAS, the balance of payments position of the United States requires the imposition of a surcharge on dutiable imports;

*    *    *    *    *    *

A. I hereby declare a national emergency during which I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States.

B. (1) I hereby terminate in part for such period as may be necessary and modify prior Presidential Proclamations which carry out trade agreements insofar as such proclamations are inconsistent with, or proclaim duties different from, those made effective pursuant to the terms of this Proclamation.

(2) Such proclamations are suspended only insofar as is required to assess a surcharge in the form of a supplemental duty amounting to 10 percent ad valorem. Such supplemental duty shall be imposed on all dutiable articles * * * provided, however, that if the imposition of an additional duty of 10 percent ad valorem would cause the total duty or charge payable to exceed the total duty or charge payable at the rate prescribed in column 2 of the Tariff Schedules of the United States, then the column 2 rate shall apply.

jurisdiction of this court over the subject matter of the instant action, (2) the statute of limitations barring plaintiff's claim under section 9(a) of the TWEA, (3) *res adjudicata* and (4) collateral estoppel.

In its consideration of this cause of action the court necessarily must initially determine the validity of defendant's alleged affirmative defense that jurisdiction does not lie with this court. This jurisdictional defense of the defendant is based upon the provision contained in section 9(a) of the TWEA that in any action brought thereunder to recover property "held" and/or "vested" pursuant to section 5(b) by the United States, suit may be instituted "in the district court of the United States." Accordingly, the defendant contends, jurisdiction with respect thereto has been placed by the Congress exclusively in the United States district court.

The plaintiff asserts, and with some justification, that it has been placed on the horns of a dilemma by defendant's jurisdictional defense in light of the circuitous journey which has been necessitated to date in connection with an attempt to seek a full judicial resolution of the surcharge issue and, in particular, with respect to the right of recovery of the supplemental duty paid by the plaintiff under the provisions of section 9(a) of the TWEA. The import of the decisions rendered in the surcharge cases adjudicated in the United States district courts and affirmed upon appellate review, in essence, held that the Customs Court, now the United States Court of International Trade, properly assumed jurisdiction

over challenges to the surcharge imposed by Presidential Proclamation 4074 and that by virtue of the exclusive jurisdiction granted to this court by the provisions of 28 U.S.C. § 1582 (1976), the United States district court did not possess jurisdiction of the subject matter relating to imports.[5]

Notwithstanding the plaintiff in its argument has relied principally upon the provisions of section 9(a) of the TWEA to provide the relief sought in the instant proceeding, it will be noted that among other bases the plaintiff has specifically claimed jurisdiction under 28 U.S.C. § 1581(a) providing:

§ 1581. Civil actions against the United States and agencies and officers thereof

(a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.[6]

It is by virtue of the jurisdiction acquired pursuant to the foregoing statutory provision that this court proceeds with the determination of the instant action and, accordingly, denies the defendant's motion to dismiss the action of the plaintiff for lack of jurisdiction.

In accepting jurisdiction over the subject matter herein it cannot be said that the court is so circumscribed as to preclude its consideration of statutory provisions which may have been alleged to be applicable and/or controlling. In other words, instead

---

**5.** In the decisions in *Pollack v. Blumenthal, supra,* and *Cornet Stores v. Morton, supra,* the respective United States courts did not address at length the applicability of section 9(a) with respect to the recovery of property in the form of the supplemental duties imposed by the surcharge in issue and paid by the plaintiffs. Nor did the decisions therein address at length the exclusivity of the jurisdiction of the United States district court with respect to the claim brought allegedly pursuant to section 9(a), as herein asserted. Principal reference thereto is contained only by way of a footnote in the *Pollack* decision, stating:

    \* \* \* It is obvious on its face that 9(a) confers jurisdiction upon the federal district

courts only to consider challenges to the wartime application of section 5(b) and to identifications of parties as 'enemies.' Section 9(a) is not relevant to those portions of Section 5(b) which empower the President to regulate foreign trade during peacetime.
444 F.Supp. at 59–60, n.2.

**6.** Though enacted October 10, 1980, more than six years after this suit was filed, this section was made applicable to the suit at hand by Act of December 17, 1980, P.L. 96–542, 94 Stat. 3209 section (a) which declared that 28 U.S.C. § 1581(a) was applicable to civil actions pending on or commenced on or after November 1, 1980.

of skirting the parameters of section 9(a) of the TWEA, with only oblique references thereto, this court deems it not only proper but obligatory at the outset to consider the applicability of this section of the Trading With the Enemy Act with respect to the claim which plaintiff asserts has been neither determined on its merits in *United States v. Yoshida International, supra, Alcan Sales v. United States, supra,* nor in any subsequent action.

From the time of the initial enactment of the Trading With the Enemy Act, it is clear that two distinct and independent powers were conferred therein on the President by the Congress: (1) the power to "regulate" and (2) the power to "seize" and "hold" property. In the original act enacted in 1917 the former power was conferred by section 5(b), the latter power by section 7(c). It was solely with respect to the property seized and held by the direction of the President in accordance with the power conferred upon him by section 7(c) that authority was granted to a claimant, not an ene-

my or ally of an enemy, by section 9 to institute a suit in equity in the district court of the United States to establish his right, title or interest thereto. Through successive amendments, particularly with respect to section 5(b), the powers of the President under the TWEA were from time to time expanded. In consideration of the surcharge presently in issue, we are, accordingly, guided by section 5(b) of the Act as amended in 1941.[7]

While amendments to the respective sections of the TWEA were made from time to time, it is noteworthy that section 9(a) continued to remain without change and in its original form as enacted. This fact served as the occasion for the Supreme Court in *Clark v. Uebersee Finanz-Korp.,* 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947), to consider the relationship between section 2, section 5(b) as amended and section 9(a) of the Act and their respective applications. Although the Court therein expressly recognized that the amended section 5(b) "* * * granted the President the power to vest in

---

7. Section 5(b) of the Trading With the Enemy Act as amended on December 18, 1941 provides:

(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the Presi-

dent, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; and the President shall, in the manner hereinabove provided, require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in this subdivision either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of this subdivision, and in any case in which a report could be required, the President may, in the manner hereinabove provided, require the production, or if necessary to the national security or defense, the seizure, of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person; and the President may, in the manner hereinabove provided, take other and further measures not inconsistent herewith for the enforcement of this subdivision.

an agency designated by him 'any property or interest of any foreign country or national thereof,'" the footnote contained in the Court's decision makes it abundantly clear that the amended section 5(b) *also* granted to the President the additional powers enumerated therein, specifically a regulatory power.[8]

It is these two distinct independent powers that this court deems necessary to address in making a determination which, hopefully, will effect a resolution of the issue involved herein. If the imposition of the supplemental duties pursuant to Presidential Proclamation 4074 constituted an act causing a "vesting" of any property or interest of any foreign country or national thereof, then and in that event a claim for the recovery of such property might be maintained by the plaintiff under section 9(a). On the other hand, if the imposition of the supplemental duty imposed by Presidential Proclamation 4074 was in fact only an exercise of a delegated authority under section 5(b) to regulate importations during a period of national emergency, then and in that event section 9(a) and the provisions thereof are inapplicable. It is only if the applicability of section 9(a) is confirmed that it becomes necessary to reach the issue of the jurisdiction of this court thereunder.

The court concludes that plaintiff's claim predicated under section 9(a) of the TWEA is misconceived and misplaced. The provisions of section 9(a) serve a purpose directly related to the "vesting" power granted to the President by section 5(b). It is by virtue of section 9(a) that the constitutionality of the "vesting" power is insured. In *Societe Internationale v. Rogers*, 357 U.S. 197, 211, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958), the United States Supreme Court stated:

> Past decisions of this Court emphasize that this summary power to seize property which is believed to be enemy-owned is

rescued from constitutional invalidity under the Due Process and Just Compensation Clauses of the Fifth Amendment only by those provisions of the Act which afford a nonenemy claimant a later judicial hearing as to the propriety of the seizure. (Citations omitted.)

This court, however, has not been persuaded that the purpose and intent of the President in imposing the surcharge in question was to sequester and hold property in which any foreign country or a national thereof had an interest. Neither the declaration of the emergency by the President nor the manner of imposition of the surcharge would lend credence to such a contention. The preservation of our monetary reserves, the maintenance of an international competitive position, the preservation of a favorable balance of payments position, indeed, are objectives which are not consonant with the objective of impounding foreign assets within this country. The uniform rate of supplemental duty imposed on imports from all nations without discrimination likewise fails to support any attempted rationalization that the imposition of the surcharge by the President constituted an act of appropriation of the property or property interests of a foreign nation or a national thereof creating a claim which could be asserted by a citizen of the United States instituting a legal action for the recovery thereof under the provisions of section 9(a) of the TWEA.

As afore-indicated, plaintiff has acknowledged that it does not take issue with the decision of our appellate court in the case of *United States v. Yoshida International, supra*. In view of this acknowledgment it is difficult to ascertain the consistency of plaintiff's present contention that a determination with respect to the validity of the surcharge in question and that a recovery of the additional duties paid by the plaintiff

**8.** The footnote contained in the Court's decision stated:

> Section 5(b)(1), as amended, also granted the President the power to 'investigate, regulate, direct and compel, ... any ... importation ...' At 485, n.4, 68 S.Ct. at 176, n.4.

*See also, United States v. Yoshida International, supra*, wherein our appellate court recognized that section 5(b) granted to the President the power to "vest" as well as the power to "regulate." 63 CCPA at 24, n.17, 526 F.2d 560.

as a result of the imposition of such surcharge now should be made in accordance with the provisions of section 9(a) of the TWEA.

The decision of our appellate court in the *Yoshida* case is explicit in its holding that the President was delegated the authority by section 5(b), during war or national emergency, to "regulate importation." As stated by the court therein the sole question which remained to be determined was "what means of execution of the delegated power are permissible." 63 CCPA at 24, 526 F.2d 560. The court thereupon, recognizing the long-established constitutional principle that the power to tax and impose duties on imports may be employed in the exercise of the separate and distinct power to regulate commerce, upheld the validity and constitutionality of the surcharge imposed by Presidential Proclamation 4074 and the supplemental duties assessed thereunder. To again review at length the authorities supportive of our appellate court's determination in *Yoshida* would be only time-consuming and without significant purpose. *See: Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *Hampton & Co. v. United States,* 276 U.S. 394, 411, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928); *McGoldrick v. Gulf Oil Corp.,* 309 U.S. 414, 428, 60 S.Ct. 664, 669, 84 L.Ed. 840 (1940).

However, the plaintiff in an effort to circumvent the *Yoshida* decision seeks refuge in the statement contained therein that "the surcharge was not imposed to raise revenue but to provide the U.S. external position with some temporary protection." 63 CCPA at 29, n. 26, 526 F.2d 560. Contending that the President thus was "taking" property of American citizens for the public good in time of national emergency to force foreign countries having an interest in such property to "come to terms" on an international monetary agreement, the plaintiff concludes that it has been deprived of its constitutional right of just compensation. Suffice it to say, plaintiff's argument must be found wanting in relevancy as well as in substance. The provision contained in Presidential Proclamation 4074 that the total duty, including the 10% supplemental duty, could in no event exceed the rate prescribed in column 2 of the Tariff Schedules of the United States, negates the hypothesis of the plaintiff that the imposition of the surcharge was of such an arbitrary, unreasonable and confiscatory character as to constitute a "taking" without just compensation. The incongruity of plaintiff's contention may be evidenced by the recent decision of the United States Supreme Court in the case of *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978):

> "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), and this Court has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values. Exercises of the taxing power are one obvious example.

There are occasions, however, when certain decisions, despite the dust which might have accumulated upon their yellowed pages, place in perspective more accurately the pertinent and applicable principles of law than can be articulated in 10,000 words. In the case of *Board of Trustees v. United States,* 289 U.S. 48, 58–59, 53 S.Ct. 509, 510–511, 77 L.Ed. 1025 (1933), Chief Justice Hughes has set forth with singular clarity the distinction between the separate and independent powers to tax and lay duties and the laying of duties in the exercise of that independent power to regulate commerce.

> It is true that the taxing power is a distinct power; that it is distinct from the power to regulate commerce. *Gibbons v. Ogden, supra,* p. 201 of 9 Wheat., 6 L.Ed. 23. It is also true that the taxing power embraces the power to lay duties. Art. I, § 8, par. 1. But because the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in

the exercise of the power to regulate commerce. The contrary is well established. *Gibbons v. Ogden, supra*, p. 202 of 9 Wheat., 6 L.Ed. 23. "Under the power to regulate foreign commerce Congress impose duties on importations, give drawbacks, pass embargo and non-intercourse laws, and make all other regulations necessary to navigation, to the safety of passengers, and the protection of property." *Groves v. Slaughter*, 15 Pet. 449, 505, 10 L.Ed. 800. The laying of duties is "a common means of executing the power." 2 Story on the Constitution, § 1088. It has not been questioned that this power may be exerted by laying duties "to countervail the regulations and restrictions of foreign nations." *Id.*, § 1087. And the Congress may, and undoubtedly does, in its tariff legislation consider the conditions of foreign trade in all its aspects and effects. Its requirements are not the less regulatory because they are not prohibitory or retaliatory. They embody the congressional conception of the extent to which regulation should go. But if the Congress may thus exercise the power, and asserts, as it has asserted here, that it is exercising it, the judicial department may not attempt in its own conception of policy to distribute the duties thus fixed by allocating some of them to the exercise of the admitted power to regulate commerce and others to an independent exercise of the taxing power. The purpose to regulate foreign commerce permeates the entire congressional plan. The revenue resulting from the duties "is an incident to such an exercise of the power. It flows from, but does not create the power." *Id.*

From the explicit language of Presidential Proclamation 4074 this court is satisfied that, as stated in *Board of Trustees v. United States, supra*, the purpose to regulate foreign commerce under the authority delegated to him by section 5(b) permeated the entire plan of the President.

■ Jurisdiction of the instant action having been acquired pursuant to 28 U.S.C. section 1581(a), the court finds that section 9(a) of the TWEA is inapplicable to the determination of the issue herein. The imposition of the surcharge in question was a valid exercise of authority delegated to the President by section 5(b) of the TWEA to regulate importations at a time of a declared national emergency and for the purposes set forth with particularity in Presidential Proclamation 4074. The imposition of the surcharge did not constitute an act causing a "vesting" within the meaning of section 5(b). No conclusion can be reached therefore by this court other than the decisions of our appellate court in the case of *United States v. Yoshida International, supra*, and in the case of *Alcan Sales v. United States, supra*, are, in fact, stare decisis of the issues herein.

In view of the foregoing it is unnecessary to consider the additional defenses asserted by the defendant.

The motion of the plaintiff for summary judgment, accordingly, is denied. The motion of the defendant, in the alternative, for summary judgment, is granted.

Let judgment be entered accordingly.