**ALCAN SALES, DIV. OF ALCAN ALUMINUM CORP., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 82-17.**

United States Court of Appeals, Federal Circuit.

Nov. 18, 1982.

David O. Elliott, New York City, argued for appellant. With him on the brief were Rufus E. Jarman, Jr., Michael A. Johnson and Barnes, Richardson & Colburn, New York City.

David M. Cohen, Washington, D.C., argued for appellee. With him on the brief was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C.

Before MARKEY, Chief Judge, and BENNETT and SMITH, Circuit Judges.

BENNETT, Circuit Judge.

This is an appeal from a decision of the United States Court of International Trade, *Alcan Sales v. United States,* 528 F.Supp. 1159 (C.I.T.1981). The court below held that Proclamation No. 4074, 85 Stat. 926 (1971), which established a 10-percent ad valorem duty on dutiable imports, was a valid exercise of the authority delegated to the President by the Trading With the Enemy Act, 50 U.S.C.App. § 5(b), to regulate imports at a time of declared national emergency. The court below also held that section 9(a) of the Trading With the Enemy Act does not require the government to return the surcharges collected under Presidential Proclamation 4074, as that section is inapplicable to the regulatory provisions of section 5(b). The United States Court of International Trade therefore granted the government's motion for summary judgment. We *affirm.*

During the summer of 1971, the United States was faced with an economic crisis. The nation suffered under an exceptionally severe and worsening balance of payments deficit. The gold reserve backing of the U.S. dollar had dropped from $17.8 billion in 1960 to less than $10.4 billion in June of 1971, reflecting a growing lack of confi-

dence in the U.S. dollar abroad. Foreign exchange rates were being controlled by some of our major trading partners in such a way as to overvalue the U.S. dollar. That action, by stimulating U.S. imports and restraining U.S. exports, contributed substantially to the balance of payments deficit.[1]

As part of a program to deal with this economic crisis, the President, on August 15, 1971, issued Proclamation No. 4074, 85 Stat. 926, which established an additional 10-percent ad valorem duty upon dutiable articles imported into the United States.[2] Less than 5 months later, on December 20, 1971, the surcharge program was terminated by Proclamation No. 4098, 3 C.F.R. 116 (1971 Comp.). The reason for ending the surcharge program was the formulation of a multilateral agreement (the "Smithsonian Agreement") among the major industrial nations that gave promise of ending the balance of payments problem. *See United States v. Yoshida International, Inc.*, 526 F.2d 560, 568–69 (Cust. & Pat.App.1975).

Unfortunately, the termination of Presidential Proclamation 4074 did not end the controversy surrounding the surcharge program. Many importers subsequently challenged the validity of Proclamation 4074, alleging that it was an *ultra vires* presidential act. The United States Court of Customs and Patent Appeals, however, held that Presidential Proclamation 4074 was a valid exercise of the authority delegated to the President by section 5(b) of the Trading With the Enemy Act[3] (TWEA) to regulate

---

1. The preceding account of the economic situation facing the United States in 1971 is taken verbatim from *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 567 (Cust. & Pat.App.1975) (footnotes omitted).

2. Presidential Proclamation 4074 states in relevant part that:

"WHEREAS, there has been a prolonged decline in the international monetary reserves of the United States, and our trade and international competitive position is seriously threatened and, as a result, our continued ability to assure our security could be impaired;

"WHEREAS, the balance of payments position of the United States requires the imposition of a surcharge on dutiable imports;

  \*   \*   \*   \*   \*   \*

"A. I hereby declare a national emergency during which I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States.

"B. (1) I hereby terminate in part for such period as may be necessary and modify prior Presidential Proclamations which carry out trade agreements insofar as such proclamations are inconsistent with, or proclaim duties different from, those made effective pursuant to the terms of this Proclamation.

"(2) Such proclamations are suspended only insofar as is required to assess a surcharge in the form of a supplemental duty amounting to 10 percent ad valorem. Such supplemental duty shall be imposed on all dutiable articles \* \* \* provided, however, that if the imposition of an additional duty of 10 percent ad valorem would cause the total duty or charge payable to exceed the total duty or charge payable at the rate prescribed in column 2 of the Tariff Schedules of the United States, then the column 2 rate shall apply." [Proclamation No. 4074, 85 Stat. 926, 926–27 (1971).]

3. Section 5(b) provides in relevant part that:

"(b)(1) During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and ·

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

"by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States \* \*." [50 U.S.C.App. § 5(b) (1976).]

Section 5(b) was amended in 1977, Act of Dec. 28, 1977, Pub.L.No. 95–223, tit. I,

imports at a time of declared national emergency. *See Alcan Sales v. United States,* 534 F.2d 920 (Cust. & Pat.App.), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976); *Yoshida,* 526 F.2d at 584.

Following the *Yoshida* and *Alcan Sales* decisions, several importers initiated a new wave of litigation in the federal district courts. The basis for their actions was section 9(a) of the TWEA, which permits persons who are not enemies or allies of enemies to seek recovery of property seized under the TWEA.[4] Those plaintiffs contended that section 9(a) requires the government to return property taken under either the seizure or regulatory provisions of section 5(b) upon a showing of no enemy interest in that property. The courts that were confronted with this issue, however, held that section 9(a) does not apply to the regulatory provisions of section 5(b). *See Cornet Stores v. Morton,* 632 F.2d 96 (9th Cir.1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981); *Henry Pollak, Inc. v. Blumenthal,* 444 F.Supp. 56 (D.D.C.1977), *aff'd mem.,* 593 F.2d 1371 (D.C.Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). Because no section 9(a) claim was presented, the *Cornet Stores* and *Henry Pollak* courts held that litigation involving the surcharge program did not belong in district court, but was within the exclusive jurisdiction of the United States Customs Court under 28 U.S.C. § 1582 (1976).[5]

In response to these decisions, Alcan Sales instituted this action in the United States Court of International Trade (formerly the United States Customs Court) seeking the return of its surcharge payments under section 9(a) of the TWEA. The court held that the TWEA confers two distinct and independent powers upon the President: (1) the power to regulate; and (2) the power to seize and hold property. *See Alcan Sales v. United States,* 528 F.Supp. 1159, 1162 (C.I.T.1981). Section 9(a)'s application, however, is limited to actions involving an exercise of the President's seizure or vesting powers under section 5(b). Because the import surcharge program was authorized by section 5(b)'s regulatory provisions, it did not constitute a vesting within the meaning of section 5(b). Therefore, the court held that section 9(a) was inapplicable to appellant's action. The court did not purport to have any jurisdiction under section 9(a), and indeed it does not. If a section 9(a) claim had been presented, then appellant's exclusive remedy would have been in the federal district courts. *See* 50 U.S.C.App. §§ 7(c), 9(a) (1976).

■ The issue in this appeal is whether section 9(a) of the Trading With the Enemy

§§ 101(a), 102, 103(b), 91 Stat. 1625, 1625–26, but the amendment is not pertinent to the issues presented in this litigation.

4. Section 9(a) provides in relevant part that: "(a) Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States * * * may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest therein to which the President shall determine said claimant is entitled: *Provided,* That no such order by the President shall

bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title, or interest which he may have in such money or other property. If the President shall not so order within sixty days after the filing of such application or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may institute a suit in equity in the United States District Court for the District of Columbia or in the district court of the United States for the district in which such claimant resides * * *." [50 U.S.C.App. § 9(a) (1976).]

5. The Customs Courts Act of 1980 changed the name of the United States Customs Court to the United States Court of International Trade. Also, section 28 U.S.C. § 1582 was repealed and replaced by 28 U.S.C. § 1581. *See* Customs Courts Act of 1980, Pub.L.No. 96–417, §§ 101, 201, 94 Stat. 1727, 1727–29.

Act (TWEA) is applicable to those provisions of section 5(b) of the TWEA that empower the President to regulate foreign trade. Every court to consider this issue has determined that it is not. *See Cornet Stores*, 632 F.2d at 97–98, 98 n. 2; *Pollak*, 444 F.Supp. at 59 n. 2. We agree with those decisions as well as the one now under review.

When the Trading With the Enemy Act was first enacted in 1917 its application was restricted to wartime. *See* Act of Oct. 6, 1917, ch. 106, 40 Stat. 411. The purpose of the Act was to enable the President to prohibit trade with wartime enemies and to seize enemy-owned property. *See Pollak*, 444 F.Supp. at 59. In order to ensure that U.S. citizens would have a remedy if their property was seized under the TWEA, Congress enacted section 9(a), which established an administrative and judicial procedure by which persons who were not enemies or allies of enemies could seek recovery of property seized under the TWEA. In 1933 and again in 1941, however, Congress greatly expanded the scope of the President's powers under section 5(b) of the TWEA. *See* Act of March 9, 1933, ch. 1, § 2, 48 Stat. 1, 1–2; Act of Dec. 18, 1941, ch. 593, tit. III, § 301, 55 Stat. 839, 839–40. Under the amendments to section 5(b), the President was delegated extensive powers to regulate international economic transactions involving property in which any foreign nation or citizen, friendly or otherwise, had an interest. These powers could be exercised during either a war or period of declared national emergency. Therefore, after 1941, it was clear that section 5(b) conferred two distinct and independent powers upon the President: (1) the power to seize or "vest" property; and (2) the power to regulate.

Although Congress chose to expand significantly the President's authority under section 5(b), it did not concurrently amend the recovery provisions of section 9(a). For that reason, section 9(a) must be construed to apply as originally enacted—to those provisions of section 5(b) that empower the President to vest property. *See Cornet Stores*, 632 F.2d at 97.

Common sense also dictates that section 9(a) retain its original limitations. In amending section 5(b), Congress delegated broad and extensive powers to the President in order that he could deal effectively with national emergency situations. *See Yoshida*, 526 F.2d at 573. Extending section 9(a) to the regulatory provisions of section 5(b), however, might severely hinder the President's ability to deal effectively with a national emergency. In this case, for example, it is doubtful that the surcharge program imposed by Presidential Proclamation 4074 would have been effective if section 9(a) required the government to return the surcharges it collected. The purpose of a surcharge on imports is to decrease the demand for foreign goods by increasing the price to consumers. If importers know that they will receive a refund of any surcharges paid, then they will be less likely to pass the cost of the surcharge through to consumers. A surcharge program subject to section 9(a) would thus be less effective in decreasing the demand for foreign goods and alleviating a balance of payments problem. Therefore, it seems highly unlikely that Congress would give the President broad regulatory powers under section 5(b) in order that he could deal effectively with national emergencies and then subject these powers to section 9(a), which might render the delegated powers useless.

Thus, section 9(a) "confers jurisdiction upon the federal district courts only to consider challenges to the wartime applications of Section 5(b) [*i.e.*, the seizure or vesting of property] and to identifications of parties as 'enemies'." *Pollak*, 444 F.Supp. at 60 n. 2. It is inapplicable to a surcharge program on imports that is authorized by the regulatory provisions of section 5(b). *See Cornet Stores*, 632 F.2d at 97–98, 98 n. 2; *Pollak*, 444 F.Supp. at 60 n. 2.

■ Although section 9(a) does not apply to the regulatory provisions of section 5(b), it does not necessarily follow that the United States Court of International Trade is the proper forum for all actions arising under the regulatory provisions of section

5(b).[6]  A court must first characterize the action.  Only if the section 5(b) action bears a "substantial relation to traditional customs purposes," *Jerlian Watch Co. v. United States,* 597 F.2d 687, 691 (9th Cir.1979), will the United States Court of International Trade have jurisdiction.  As this is the case here, litigation involving the import surcharge program is within the exclusive jurisdiction of the United States Court of International Trade.  *See Cornet Stores,* 632 F.2d at 100; *Pollak,* 444 F.Supp. at 59–60.  Prior litigation under former section 1582 (now section 1581)[7] has conclusively established that Presidential Proclamation 4074 was a valid exercise of the authority delegated to the President under the regulatory provisions of section 5(b).  *See Alcan Sales,* 534 F.2d at 920; *Yoshida,* 526 F.2d at 584.

Appellant now contends, however, that the United States Court of International Trade has jurisdiction under section 1581 to hear its section 9(a) claim and to return its surcharge payments notwithstanding the validity of Presidential Proclamation 4074.  This argument is without merit.  For the reasons stated above, section 9(a) is irrelevant to litigation involving an import surcharge program established under the regulatory provisions of section 5(b).  In fact, the inapplicability of section 9(a) to section 5(b)'s regulatory provisions is one of the reasons why the United States Court of International Trade has exclusive jurisdiction over this matter.

Therefore, after thorough consideration of the parties' submissions and after oral argument, the decision of the United States Court of International Trade granting the government's motion for summary judgment is affirmed.

**6.**  The regulatory provisions of section 5(b) delegate broad and varied powers to the President, which permit the President to engage in a wide range of economic regulations.  Some of the President's regulatory actions may come within the jurisdiction of the federal district courts, while others may be within the exclusive jurisdiction of the United States Court of International Trade.  *See Henry Pollak, Inc. v. Blumenthal,* 444 F.Supp. 56, 59 (D.D.C.1977), *aff'd mem.,* 593 F.2d 1371 (D.C.Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979).

**7.**  Section 1581 contains the major jurisdictional grants of authority to the United States Court of International Trade.  It substantially restates, with some modifications, the jurisdictional authority of the former United States Customs Court under 28 U.S.C. § 1582.  *See* H.R.Rep.No. 1235, 96th Cong., 2d Sess. 44–48, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3729, 3755–60.